EXHIBIT C

3061-0001

1  Mark R. Mittelman (SBN 96598)
   LAW OFFICES OF MARK R. MITTELMAN
2  A Professional Corporation
   190 North Wiget Lane, Suite 101
3  Walnut Creek, California  94598
   Telephone: (925) 256-0677
4  Facsimile:  (925) 256-0679
   E-mail: mmittelman@mittellaw.com
5  Attorneys for Defendant / Counter-Claimant /
   Cross-Complainant
6  PRIVATE EYES, INC.

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11

12  PRIVATE EYES, INC., a California corporation      Case No. C07-2424 SC

13        Counterclaimant and Cross-Complainant,      **FIRST AMENDED COUNTERCLAIM**

14        vs.

15  FIRST ADVANTAGE BACKGROUND                        **1. BREACH OF WRITTEN CONTRACT**
    SERVICES CORP., a Florida corporation;            **2. BREACH OF ORAL CONTRACT**
16                                                     **3. UNJUST ENRICHMENT**
          Counterdefendant,.                          **4. INTENTIONAL INTERFENCE WITH**
17                                                     **CONTRACTUAL RELATIONSHIP**
    and                                               **5. INTENTIONAL INTERFERENCE**
18                                                     **WITH PROSPECTIVE ECONOMIC**
    ROES 1-20,                                        **ADVANTAGE**
19                                                     **6. FRAUD --FALSE PROMISE I**
          Cross-Defendants.                           **7.  FRAUD – FALSE PROMISE II**
20                                                     **8.  ACCOUNT STATED [FIRST**
                                                       **ADVANTAGE ONLY]**
21                                                     **9.  OPEN BOOK ACCOUNT (COMMON**
                                                       **COUNT) [FIRST ADVANTAGE ONLY]**
22
                                                       **DEMAND FOR JURY TRIAL**
23

24        PRIVATE    EYES,    INC.    hereby    counterclaims    against    FIRST    ADVANTAGE

25  BACKGROUND   SERVICES   CORP.   and   cross-complains   against   ROES   1-20   and   alleges   as

26  follows:

27                              **PARTIES**

28        1.      PRIVATE EYES, INC. (hereinafter "PEI") is, and at all relevant times mentioned

LAW OFFICES OF
MARK R. MITTELMAN
A Professional Corporation
190 NORTH WIGET LANE
SUITE 101
WALNUT CREEK, CA 94598
Phone: (925) 256-0677
FAX: (925) 256-0679

herein was, a corporation organized and existing under the laws of the State of California with its principal place of business in Walnut Creek, California.  PEI is in the business of providing a diverse array of background checks, and similar services, for employers seeking to hire and retain personnel.  Among other services, these include drug testing, physicals, motor vehicle records (MVR) checks, and employee background verifications.  On occasion, PEI subcontracts such services to third-party vendors.

2.     PEI is informed and believes, and on that basis alleges, that FIRST ADVANTAGE BACKGROUND SERVICES CORP. (hereinafter "FIRST ADVANTAGE") is a Florida corporation with its principal place of business in St. Petersburg, Florida.  PEI is further informed and believes, and on that basis alleges, that FIRST ADVANTAGE is the successor in interest to EMPLOYEE INFORMATION SERVICES, INC. (hereinafter "EIS").  As successor in interest, FIRST ADVANTAGE is legally responsible for all obligations, arising from contract, tort, statute, or otherwise, incurred by EIS.  FIRST ADVANTAGE is sometimes referred to herein as "EIS / FIRST ADVANTAGE" to make it clear that it is responsible for both its own obligations and conduct as well as the obligations and conduct of its predecessor in interest EIS.  However, no matter how denominated in this pleading, FIRST ADVANTAGE is liable for all of the obligations and conduct of EIS.

3.     PEI is ignorant of the true names and capacities of cross-defendants ROES 1 through 20, inclusive, and sues cross-defendants by fictitious names herein.  PEI prays leave to amend this Cross-Complaint to allege their true names and capacities when the same have been ascertained.

4.     That at all times herein mentioned, FIRST ADVANTAGE and ROES 1 through 20, inclusive, were the agents, servants, employees, or independent contractors of each of the remaining cross-defendants and at all times herein relevant were acting within the course and scope of said relationship.

### JURISDICTION AND VENUE

5.     The Court has original jurisdiction over this action under 28 U.S.C. §1332, in that it is a civil action between citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

LAW OFFICES OF
MARK R. MITTELMAN
A Professional Corporation
190 NORTH WIGET LANE
SUITE 101
WALNUT CREEK, CA 94598
Phone: (925) 256-0677
FAX:  (925) 256-0679

6.      Venue for this counter-claim is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. §1391 since PEI has a substantial presence in the Northern District of California and FIRST ADVANTAGE has elected to bring its Complaint in this venue.  Venue for a counter-claim is proper in the federal district court where the Complaint is brought.

7.      Venue for the cross-complaint is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. §1391 on one or more of the following grounds: (1) ROES 1-20 have a substantial presence in the district, (2) a substantial part of the events and omissions, which gave rise to this action, including the place where at least part of the contracts were to be performed and where the breaches occurred took place, were in this district, and (3) a substantial portion of the tortious actions took place within this district.

## COMMON ALLEGATIONS

8.      In or about 2002, PEI entered into a verbal contract with Coca Cola Enterprises, Inc. (hereinafter "CCE") to provide various pre-employment screening background investigations  and drug testing services for personnel that CCE was considering for employment, retention, and/or promotion in its company.  Such services included, but were not limited to, MVR's, applicant / employee physicals, and drug testing.  The verbal contract between PEI and CCE provided that CCE would assign the services to PEI on an as-needed basis, and PEI would perform such services at a stated price.  The verbal contract permitted, but did not require, that PEI could subcontract the performance of some or all of the services to third-party vendors.

9.      PEI had a reasonable expectation that it would periodically receive assignments from CCE for the services mentioned above, so long as it performed the services in a satisfactory manner.

10.     In or about March 2002, PEI subcontracted some of the services referenced above to EIS, the predecessor in interest to FIRST ADVANTAGE.  The services included driver qualification file maintenance, applicant / employee physicals, and drug testing.  A true and correct copy of the written contract between PEI and EIS, which was drafted by EIS and signed by PEI's authorized agent Sandra James on March 29, 2002, is attached as Exhibit A.

///

LAW OFFICES OF
MARK R. MITTELMAN
A Professional Corporation
190 NORTH WIGET LANE
SUITE 101
WALNUT CREEK, CA 94598
Phone: (925) 256-0677
FAX: (925) 256-0679

11.    As part of the written contract attached as Exhibit A, EIS represented and agreed that it would not "directly solicit Coca-Cola for any of the services provided by Private Eyes unless it receives the written consent of Private Eyes."

12.    PEI and EIS both agreed that only PEI had a contractual relationship with CCE for the services that were subcontracted in the written contract attached as Exhibit A. Accordingly, only PEI would invoice CCE for the services. In turn, PEI agreed to pay EIS within a reasonable amount of time of receiving payment from CCE. If CCE took any payment discounts, or otherwise reduced its payments, EIS agreed that its own invoice would be discounted / reduced to the same extent.

13.    In or about September 2003, FIRST ADVANTAGE acquired EIS and became its legal successor in interest for all rights and liabilities, including all rights and liabilities that EIS had under the written contract attached as Exhibit A. In an agreement dated October 8, 2003, drafted by FIRST ADVANTAGE and signed by Sandra James as officer for PEI, FIRST ADVANTAGE reiterated its prior agreement to not use any confidential information "obtained from Private Eyes to intentionally solicit, endeavor, to entice away from, or otherwise interfere with the relationship Private Eyes has with any of its employment background screening customers, clients, suppliers, or other entity with whom they do business, based on the Confidential Information." Furthermore, FIRST ADVANTAGE agreed that it "may not use the Confidential Information for sales and marketing efforts to its existing or prospective employment background screening customers." A true and correct copy of the Agreement is attached as Exhibit B.

14.    In or about January or February 2004, FIRST ADVANTAGE solicited CCE to obtain the contract for MVR's. These are the same services that CCE had been assigning to PEI pursuant to their verbal contract. This solicitation was a direct violation of the terms set forth Exhibit A and Exhibit B, which prohibited such solicitation.

15.    As a direct result of FIRST ADVANTAGE'S solicitation, and for no other reason, CCE ceased assigning motor vehicle records to PEI and began assigning them to FIRST ADVANTAGE. PEI was therefore deprived of all profits it had been making on the MVR assignments.

///

LAW OFFICES OF
MARK R. MITTELMAN
A Professional Corporation
190 NORTH WIGET LANE
SUITE 101
WALNUT CREEK, CA 94598
Phone: (925) 256-0677
FAX: (925) 256-0679

-4-

FIRST AMENDED  COUNTERCLAIM  Case No. C07-2424 SC

16.     In or about April of 2004, PEI learned for the first time that FIRST ADVANTAGE had solicited the MVR's from CCE and was now doing such work directly for CCE.

17.     PEI attempted to negotiate a reasonable resolution of FIRST ADVANTAGE'S violation of the non-solicitation agreements set forth in Exhibit A and Exhibit B.  After much negotiation, FIRST ADVANTAGE verbally agreed that it would pay PEI $1.80 for each MVR that it performed directly for CCE.  These were labeled "commissions," although they were really reimbursement for at least some of the lost profits that PEI had sustained in the past and would continue to sustain in the future.  The $1.80 was a compromise, and not necessarily the actual amount of lost profits that PEI was actually sustaining.  The lost profit calculation did not reimburse PEI for the loss in value the company would sustain because of the reduction in the revenue stream from CCE services.  A true and correct copy of a letter from PEI's counsel, to Bart Valdez of FIRST ADVANTAGE, is attached as Exhibit C.  Exhibit C confirms the verbal agreement that the parties entered into.

18.     Pursuant to the verbal agreement. FIRST ADVANTAGE made payments to PEI for the MVR's it was now performing directly for CCE.  FIRST ADVANTAGE paid $1.80 for some of the MVR's it performed directly for CCE.  PEI later learned that it did not pay for all of them.  The number of MVR's that FIRST ADVANTAGE did not pay for are unknown to PEI at this time, and will be the subject of discovery.  FIRST ADVANTAGE made partial payments on the MVR's for some months, and then cease making payments entirely.

19.     In or about spring 2005, PEI learned for the first time that FIRST ADVANTAGE was soliciting all remaining services from CCE.  These were other services, such as physicals and drug testing, that CCE had been assigning to PEI and that PEI had in turn subcontracted to FIRST ADVANTAGE.  The solicitation was in direct violation of the terms of Exhibit A and Exhibit B.

20.     In or about the spring of 2005, PEI learned for the first time that FIRST ADVANTAGE had disclosed confidential and proprietary information to CCE.  This confidential and proprietary information included the profits that PEI earned on the physicals that CCE assigned to it. CCE used this confidential and proprietary information to insist that PEI charge less for the services.  FIRST ADVANTAGE only obtained access to PEI's profit margin on the physicals because it had

LAW OFFICES OF
MARK R. MITTELMAN
A Professional Corporation
190 NORTH WIGET LANE
SUITE 101
WALNUT CREEK, CA 94598
Phone: (925) 256-0677
FAX:  (925) 256-0679

1  subcontracted to perform the work for PEI.  As such, FIRST ADVANTAGE's disclosure was in

2  violation of the terms of Exhibit B.

3     21.  On or about September 28, 2006, CCE informed PEI that it would be assigning all of

4  the services to different vendors.  PEI is informed and believes, and based thereon alleges, that CCE

5  made this decision for the following two reasons: (1) it was not satisfied with the quality and

6  timeliness of the services that PEI had subcontracted to EIS / FIRST ADVANTAGE and (2) it was

7  wary of the friction that had been created between PEI and EIS / FIRST ADVANTAGE which arose

8  from FIRST ADVANTAGE's direct solicitation of CCE services.

9     22.  As a direct and proximate result of the foregoing, PEI has sustained damages in the

10  amount of past and future lost profits that will be determined by expert testimony, but which is

11  expected to amount to no less than $5 million dollars plus interest.

12                    **FIRST CAUSE OF ACTION**

13                    **BREACH OF WRITTEN CONTRACT**

14                         **[All Defendants]**

15     23.  PEI repeats and re-alleges the allegations contained in paragraph 1 through 22,

16  inclusive, above and incorporates the same by reference as though set forth in fill herein.

17     24.  On or about March 29, 2002, PEI and EIS entered into the contract attached as Exhibit

18  A.

19     25.  On or about September 2003, FIRST ADVANTAGE became the successor in interest

20  to EIS, and therefore assumed responsibility for all of its legal obligations, including those set forth in

21  Exhibit A.

22     26.  On or about October 2003, PEI and FIRST ADVANTAGE entered into the contract

23  attached as Exhibit B.

24     27.  PEI complied with all conditions precedent under Exhibits A and B, and performed all

25  of its obligations that were not legally suspended, excused, or extinguished.

26     28.  FIRST ADVANTAGE breached the terms of Exhibits A and B by directly soliciting

27  MVR's from CCE.  PEI is also informed and believes, and based thereon alleges, that ROES 1-20

28  materially contributed to the breach.

LAW OFFICES OF
MARK R. MITTELMAN
A Professional Corporation
190 NORTH WIGET LANE
SUITE 101
WALNUT CREEK, CA 94598
Phone: (925) 256-0677
FAX: (925) 256-0679

-6-
FIRST AMENDED  COUNTERCLAIM  Case No. C07-2424 SC

29.     FIRST ADVANTAGE further breached the terms of Exhibit B by disclosing confidential and proprietary information to CCE, including but not limited to the profit margins that PEI earned on the physicals.  PEI is also informed and believes, and based thereon alleges, that ROES 1-20 materially contributed to the breach.

30.     FIRST ADVANTAGE further breached the terms of Exhibits A and B by failing to perform the services it subcontracted to perform in a manner that was satisfactory to CCE.  Satisfactory performance was an implied term of Exhibit A and Exhibit B.  PEI is also informed and believes, and based thereon alleges, that ROES 1-20 materially contributed to the breach.

31.     As a direct and proximate result of the aforementioned mentioned breaches of contract, PEI has sustained damages in an amount to be proved at trial, but in no event less than $5 million, plus prejudgment interest at the legal rate.  Further, based on the aforementioned breaches of contract, PEI has incurred attorneys' fees and costs of bringing this action.  PEI will continue to incur such interest, fees and costs in amounts to be proven at trial.

WHEREFORE, PEI prays for relief as set forth below.

## SECOND CAUSE OF ACTION

## BREACH OF ORAL CONTRACT

### [All Defendants]

32.     PEI repeats and re-alleges the allegations contained in paragraph 1 through 22, inclusive, above and incorporates the same by reference as though set forth in fill herein.

33.     In or about the summer of 2004, FIRST ADVANTAGE verbally agreed to pay $1.80 to PEI for each MVR that FIRST ADVANTAGE directly performed for CCE.  The agreement was reached to resolve a legal dispute between PEI and FIRST ADVANTAGE, and therefore valid consideration supports the agreement.  In or about October of 2006, FIRST ADVANTAGE agreed to have all billings for the services that FIRST ADVANTAGE performed for CCE to go through PEI, so PEI could earn a profit on the services.  FIRST ADVANTAGE made this promise because it had improperly solicited business from CCE, wanted to continue its business relationship with PEI, and wanted to obtain payments for outstanding services.

///

LAW OFFICES OF
MARK R. MITTELMAN
A Professional Corporation
190 NORTH WIGET LANE
SUITE 101
WALNUT CREEK, CA 94598
Phone: (925) 256-0677
FAX: (925) 256-0679

34.    FIRST ADVANTAGE breached the aforementioned verbal agreements by not paying $1.80 for each and every MVR it performed for CCE and not allowing the billings to go through PEI. PEI did not learn that FIRST ADVANTAGE had not paid for each and every MVR until the summer of 2005, and to this day does not know how many MVR's FIRST ADVANTAGE did not actually pay the $1.80 on. PEI is also informed and believes, and based thereon alleges, that ROES 1-20 materially contributed to the aforementioned breaches.

35.    As a direct and proximate result of the aforementioned mentioned breaches of contract, PEI has sustained damages in an amount to be proved at trial, but in no event less than $100,000, plus prejudgment interest at the legal rate. Further, based on the aforementioned breaches of contract, PEI has incurred attorneys' fees and costs of bringing this action. PEI will continue to incur such interest, fees and costs in amounts to be proven at trial.

WHEREFORE, PEI prays for relief as set forth below.

### THIRD CAUSE OF ACTION

### UNJUST ENRICHMENT

### [All Defendants]

36.    PEI repeats and re-alleges the allegations contained in paragraph 1 through 22, inclusive, above and incorporates the same by reference as though set forth in fill herein.

37.    FIRST ADVANTAGE has performed services for CCE that CCE had originally assigned to PEI.

38.    FIRST ADVANTAGE was only able to obtain such services by violating the terms of Exhibit A and Exhibit B, including the non-solicitation agreement. Based on information and belief, ROES 1-20 materially contributed to the violations.

39.    As a result of the foregoing violations, FIRST ADVANTAGE and ROES 1-20 have been unjustly enriched in an amount equal to its net profits. That amount will be proven at trial.

40.    FIRST ADVANTAGE and ROES 1-20 should therefore be disgorged of the amount of their profits that are attributable to services for CCE. The profits should be transferred to PEI by way of a constructive trust.

///

LAW OFFICES OF
MARK R. MITTELMAN
A Professional Corporation
190 NORTH WIGET LANE
SUITE 101
WALNUT CREEK, CA 94598
Phone: (925) 256-0677
FAX: (925) 256-0679

-8-

FIRST AMENDED  COUNTERCLAIM  Case No. C07-2424 SC

WHEREFORE, PEI prays for relief as set forth below.

## FOURTH CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH EXISTING

## CONTRACTUAL RELATIONSHIP

### [All Defendants]

41.    PEI repeats and re-alleges the allegations contained in paragraph 1 through 22, inclusive, above and incorporates the same by reference as though set forth in fill herein.

42.    There was a valid verbal contract between PEI and CCE for services that would last so long as PEI satisfactorily performed services for CCE.

43.    FIRST ADVANTAGE, and on information and belief ROES 1-20, knew of the contract.

44.    FIRST ADVANTAGE, and on information and belief, ROES 1-20 intended to disrupt the performance of the aforementioned contract by directly soliciting business from CCE that CCE had been assigning to PEI and by disclosing PEI's confidential and proprietary information to CCE.

45.    The conduct of FIRST ADVANTAG and ROES 1-20 prevented performance by PEI or made performance more expensive or difficult by PEI.

46.    As a direct and proximate result of the aforementioned conduct by FIRST ADVANTAGE and ROES 1-20, PEI has sustained damages in an amount to be proved at trial, but in no event less than $5 million, plus prejudgment interest at the legal rate.  Further, based on the aforementioned conduct, PEI has incurred attorneys' fees and costs of bringing this action.  PEI will continue to incur such interest, fees and costs in amounts to be proven at trial.

47.    FIRST ADVANTAGE and ROES 1-20, in doing the foregoing, acted with malice, fraud, and/or oppression and therefore punitive damages pursuant to Civil Code §3294 are appropriate.

WHEREFORE, PEI prays for relief as set forth below.

///

///

///

LAW OFFICES OF
MARK R. MITTELMAN
A Professional Corporation
190 NORTH WIGET LANE
SUITE 101
WALNUT CREEK, CA 94598
Phone: (925) 256-0677
FAX: (925) 256-0679

-9-
FIRST AMENDED  COUNTERCLAIM  Case No. C07-2424 SC

## FIFTH CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

### [All Defendants]

48.     PEI repeats and re-alleges the allegations contained in paragraph 1 through 22, inclusive, above and incorporates the same by reference as though set forth in fill herein.

49.     PEI and CCE were in an economic relationship that would have resulted in an economic benefit to PEI.

50.     FIRST ADVANTAGE, and on information and belief ROES 1-20, knew of the aforementioned economic relationship between PEI and CCE.

51.     FIRST ADVANTAGE, and on information and belief ROES 1-20, intended to disrupt the aforementioned relationship.

52.     FIRST ADVANTAGE, and on information and belief ROES 1-20, engaged in wrongful conduct through the following specific conduct:

      a.     Improperly disclosing PEI's confidential and proprietary information to CCE in violation of the Uniform Trade Secrets Acts, California Civil Code §3426 et seq.  Such confidential and proprietary information included, but was not necessarily limited to, PEI's profit margins.  Such disclosure constitutes a misappropriation of a trade secret, as that term is defined at Civil Code §3426.1, since FIRST ADVANTAGE acquired the information only because it agreed to maintain its secrecy.

      b.     Improperly disclosing PEI's confidential and proprietary information to CCE in violation of its agreement to maintain the confidential nature of the information, a common law breach of confidence.  Such confidential and proprietary information included, but was not necessarily limited to, PEI's profit margins and business methods.  Such information was novel since it had value to PEI in being kept secret from its clients, such as CCE.  Clients could potentially use such information to negotiate deals that would be more favorable to the client and less favorable to PEI.

      c.     Engaging in common law trade libel, injurious falsehood, and/or disparagement by falsely stating to CCE that PEI was incompetent to perform the services for CCE

LAW OFFICES OF
MARK R. MITTELMAN
A Professional Corporation
190 NORTH WIGET LANE
SUITE 101
WALNUT CREEK, CA 94598
Phone: (925) 256-0677
FAX:  (925) 256-0679

1  and that FIRST ADVANTAGE could do a superior job.  These false representations harmed PEI's

2  business relationship with CCE.

3        53.    PEI's relationship with CCE was in fact disrupted because of the aforementioned

4  conduct by FIRST ADVANTAGE, and on information and belief by ROES 1-20.

5        54.    As a direct and proximate result of the aforementioned conduct by FIRST

6  ADVANTAGE and ROES 1-20, PEI has sustained damages in an amount to be proved at trial, but in

7  no event less than $4-5 million, plus prejudgment interest at the legal rate.  Further, based on the

8  aforementioned conduct, PEI has incurred attorneys' fees and costs of bringing this action.  PEI will

9  continue to incur such interest, fees and costs in amounts to be proven at trial.

10        55.    FIRST ADVANTAGE, and on information and belief ROES 1-20, in doing the

11  foregoing, acted with malice, fraud, and/or oppression and therefore punitive damages pursuant to

12  Civil Code §3294 are appropriate.

13        WHEREFORE, PEI prays for relief as set forth below.

14  **SIXTH CAUSE OF ACTION**

15  **FRAUD – FALSE PROMISE I**

16  **[All Defendants]**

17        56.    PEI repeats and re-alleges the allegations contained in paragraph 1 through 22,

18  inclusive, above and incorporates the same by reference as though set forth in fill herein.

19        57.    FIRST ADVANTAGE (directly and through its predecessor in interest EIS) made a

20  promise to PEI that it would not solicit from CCE certain business services and would not disclose

21  confidential and proprietary information.  Those business services were the ones that PEI was

22  performing for CCE.  The confidential and proprietary information was information, such as profit

23  margins and business methods, that PEI of necessity would have to disclose to FIRST

24  ADVANTAGE so that it could perform its subcontracted services.  FIRST ADVANTAGE made

25  these promises in writing on or about March 19, 2002 and October 8, 2003, and verbally at other

26  times throughout the period of the business relationship between FIRST ADVANTAGE and PEI.

27  The writings dated March 19, 2002 and October 8, 2003 are respectively attached as Exhibit A and

28  Exhibit B.  The verbal representations were made as follows:

LAW OFFICES OF
MARK R. MITTELMAN
A Professional Corporation
190 NORTH WIGET LANE
SUITE 101
WALNUT CREEK, CA 94598
Phone: (925) 256-0677
FAX: (925) 256-0679

-11-
FIRST AMENDED  COUNTERCLAIM  Case No. C07-2424 SC

a.    On August 22, 2003, Todd Oliver of FIRST ADVANTAGE represented to Sandra James of PEI, at an in-person meeting at PEI's office in Walnut Creek, California, that FIRST ADVANTAGE would not directly solicit any business from CCE. This representation was made at about the time FIRST ADVANTAGE acquired EIS. At that time, Bart Valdez of FIRST ADVANTAGE, who instructed Mr. Oliver to make those representations, knew them to be false.

b.    In approximately June 2005, Hayley Hitchcock represented during a conference call with Sandra James, Nenita Reyes, and Chris Joaquin of PEI that FIRST ADVANTAGE would never again disclose confidential and proprietary information to CCE. She made these representations because FIRST ADVANTAGE had just disclosed confidential pricing information to CCE. At the time she made these representations, FIRST ADVANTAGE knew them to be false.

58.    The aforementioned promises made by FIRST ADVANTAGE was material to the business transactions between FIRST ADVANTAGE and PEI, since they were one of the primary reasons that PEI selected FIRST ADVANTAGE to perform the services. Had FIRST ADVANTAGE not made such promises, PEI would not have subcontracted any of the work to FIRST ADVANTAGE and as a consequence FIRST ADVANTAGE would not have had an inside position with CCE. FIRST ADVANTAGE's inside position greatly facilitated its ability to entice CCE away from PEI for certain business services.

59.    FIRST ADVANTAGE did not intend to perform the aforementioned promises when they made them. Rather, FIRST ADVANTAGE intended to solicit business services from CCE, including the MVR's, as soon as it had showed CCE that it could adequately perform the services for less cost. FIRST ADVANTAGE would be able to do so, in part, because it would be cutting PEI ("the middleman") out of the process. Furthermore, FIRST ADVANTAGE intended to disclose PEI's confidential and proprietary information, including pricing information and profit margins, as soon as it could obtain some benefit or advantage from CCE by doing so.

60.    FIRST ADVANTAGE intended that PEI rely on the aforementioned promises. It intended such reliance so that PEI would subcontract the services to it.

61.    PEI actually relied on the aforementioned promise by FIRST ADVANTAGE by subcontracting CCE business services, including MVR's, physicals, and drug testing, to FIRST

LAW OFFICES OF
MARK R. MITTELMAN
A Professional Corporation
190 NORTH WIGET LANE
SUITE 101
WALNUT CREEK, CA 94598
Phone: (925) 256-0677
FAX: (925) 256-0679

-12-

FIRST AMENDED COUNTERCLAIM  Case No. C07-2424 SC

1    ADVANTAGE. Had FIRST ADVANTAGE not made the aforementioned promises, PEI would not

2    have subcontracted the services to it.

3          62.    PEI reasonably relied on the aforementioned promises by FIRST ADVANTAGE since

4    non-solicitation agreements are common in these types of transactions and FIRST ADVANTAGE

5    represented itself to be an honest and ethical company. PEI did not first learn that FIRST

6    ADVANTAGE breached its promise to not solicit business from CCE until after FIRST

7    ADVANTAGE convinced CCE to switch its business for the MVR's. PEI did not first learn that

8    FIRST ADVANTAGE had solicited the other business services, including background checks, drug

9    screening, physicals, and driver qualifications, until 2005. PEI did not first learn that FIRST

10    ADVANTAGE breached its promise to not disclose confidential and proprietary information until

11    2005.

12          63.    FIRST ADVANTAGE did not perform the aforementioned promises, in that sometime

13    in 2004 it solicited MVR's from CCE and at various times between 2004 and 2006 it disclosed

14    confidential and proprietary information, including profit margins and business methods, to CCE.

15          64.    PEI was harmed by FIRST ADVANTAGE's failure to perform its promise to not

16    solicit business since CCE failed to assign further MVR's to it. PEI had a reasonable expectation that

17    had FIRST ADVANTAGE not solicited those services from CCE, CCE would have continued to

18    make such assignments to PEI so long as the services were performed satisfactorily. PEI was harmed

19    by the solicitation of the other business services, because CCE stated that the friction generated

20    FIRST ADVANTAGE trying to take business away from PEI was a factor in CCE's decision to

21    terminate its contractual relationship with PEI in September 2006. CCE was concerned that such

22    solicitation would cause disharmony, and therefore cause a reduction in the quality of the services

23    that it was being provided. PEI was harmed by FIRST ADVANTAGE's disclosure of proprietary

24    and confidential information to CCE, since CCE used such data to obtain unduly favorable

25    concessions from PEI which had the effect of reducing, or entirely eliminating, PEI's profit margins.

26          65.    On information and belief, ROES 1-20 materially contributed to EIS / FIRST

27    ADVANTAGE's failure to comply with the aforementioned promise.

28    ///

LAW OFFICES OF
MARK R. MITTELMAN
A Professional Corporation
190 NORTH WIGET LANE
SUITE 101
WALNUT CREEK, CA 94598
Phone: (925) 256-0677
FAX: (925) 256-0679

-13-
FIRST AMENDED COUNTERCLAIM  Case No. C07-2424 SC

66.     As a direct and proximate result of FIRST ADVANTAGE's failure to perform the aforementioned promise, PEI sustained monetary losses in an amount to be proven at trial, but in no event less than $500,000.  Further, based on the aforementioned conduct, PEI has incurred attorneys' fees and costs of bringing this action.  PEI will continue to incur such interest, fees and costs in amounts to be proven at trial.

67.     FIRST ADVANTAGE, and on information and belief ROES 1-20, in doing the foregoing, acted with malice, fraud, and/or oppression and therefore punitive damages pursuant to Civil Code §3294 are appropriate.

68.     The period for the statute of limitations should be tolled to a date that is no earlier than June 2005.  Until that time, PEI and FIRST ADVANTAGE had reached a verbal agreement that FIRST ADVANTAGE would compensate PEI in the amount of $1.80 for each MVR it directly performed for CCE.  PEI reasonably relied upon that agreement and therefore did not file the lawsuit. The payments from FIRST ADVANTAGE did not cease until June 2005, and therefore that is the earliest date that the limitations period should be deemed to have commenced for this cause of action. It would be inequitable to allow FIRST ADVANTAGE to avoid the consequences of its false promise because it made a further false promise to make periodic payments to compensate PEI for the loss of the MVR's.

69.     The aforementioned verbal agreement does not operate to bar this cause of action, as PEI was fraudulently induced to enter into it.  When FIRST ADVANTAGE promised to pay the $1.80 per MVR, it had no intention of complying with the agreement in its entirety.  Nevertheless, PEI actually and reasonably  relied upon the representation and therefore accepted the agreement as a reasonable resolution of the dispute.  FIRST ADVANTAGE's fraudulent misrepresentation as to its intent to make the payments permits PEI to enforce the agreement and sue for breach of contact or, at its sole option, to rescind the agreement and sue for fraud.  PEI will make such an election after the judgment is rendered after trial.

70.     Even if the statute of limitations is not tolled by the existence of the verbal agreement, the statute of limitations only applies to disclosures that PEI learned about more than three years before the filing of this lawsuit on June 22, 2007.  It did not learn of such disclosures as of that date.

LAW OFFICES OF
MARK R. MITTELMAN
A Professional Corporation
190 NORTH WIGET LANE
SUITE 101
WALNUT CREEK, CA 94598
Phone: (925) 256-0677
FAX: (925) 256-0679

-14-

FIRST AMENDED  COUNTERCLAIM  Case No. C07-2424 SC

1    PEI did not, and reasonably could not, learn of FIRST ADVANTAGE's disclosure of confidential

2    and proprietary information, including but not limited to disclosure of profit margin information, until

3    on or after June 22, 2004.

4            WHEREFORE, PEI prays for relief as set forth below.

5                        **SEVENTH CAUSE OF ACTION**

6                        **FRAUD – FALSE PROMISE II**

7                              **[All Defendants]**

8            71.    PEI repeats and re-alleges the allegations contained in paragraph 1 through 22,

9    inclusive, above and incorporates the same by reference as though set forth in fill herein.

10           72.    In or about October 2006, FIRST ADVANTAGE promised that all services it was

11   then performing for CCE would be billed through PEI.  The representation was made by Julie Waters

12   of FIRST ADVANTAGE in an e-mail to Sandra James dated November 10, 2006, wherein she

13   agreed to resume the normal practice of billing for services through PEI, thus allowing PEI to collect

14   a profit on the services, if PEI paid for all outstanding invoices.  FIRST ADVANTAGE made this

15   promise because it wanted to continue a business relationship with PEI through the time that PEI still

16   serviced CCE, which was through February 2007.  FIRST ADVANTAGE originally obtained the

17   work through PEI, and the regular practice of billing through PEI was in consideration of the fact that

18   PEI had the contract with CCE and had the right to select its vendors.

19           73.    FIRST ADVANTAGE never intended to perform the aforementioned promise.

20   FIRST ADVANTAGE had no intention at any time of having any of the billings run through PEI,

21   except for the one month where PEI would make the outstanding payment.  The promise was only

22   made so PEI would forfeit its legal rights to set-off amounts it allegedly owed to FIRST

23   ADVANTAGE, due to FIRST ADVANTAGE's violation of the non-solicitation agreements set forth

24   at Exhibit A and Exhibit B.

25           74.    FIRST ADVANTAGE intended PEI to rely upon the aforementioned promise, so that

26   it would continue to make payments to FIRST ADVANTAGE on outstanding billings.

27           75.    PEI <u>actually relied</u> upon the aforementioned promise by tendering payment on some

28   outstanding billings.  PEI would have been legally entitled to not pay those billings, to reflect a set-

LAW OFFICES OF
MARK R. MITTELMAN
A Professional Corporation
190 NORTH WIGET LANE
SUITE 101
WALNUT CREEK, CA 94598
Phone: (925) 256-0677
FAX: (925) 256-0679

-15-

FIRST AMENDED  COUNTERCLAIM  Case No. C07-2424 SC

1  off on amounts that FIRST ADVANTAGE owed for violations of the non-solicitation agreements set

2  forth at Exhibit A and Exhibit B, and because FIRST ADVANTAGE did not satisfactorily perform

3  services it had been subcontracted to perform.

4         76.    PEI justifiably relied upon the aforementioned promise, since FIRST ADVANTAGE

5  represented itself as being an honest and ethical company and had at least attempted, on some

6  matters, to compensate for its past transgressions.  PEI further justifiably relied upon the

7  aforementioned promise because FIRST ADVANTAGE had a demonstrable interest in continuing

8  the business relationship, if PEI continued to receive work from CCE, and therefore could be

9  reasonably expected to cease and desist any further conduct that would damage the relationship

10  between PEI and FIRST ADVANTAGE.

11         77.    FIRST ADVANTAGE did not perform the promise, and did not allow any billings to

12  be run through PEI.  On information and belief, ROES 1-20 materially contributed to this non-

13  performance.

14         78.    PEI was harmed by the aforementioned failure to perform the promise, in that it paid

15  FIRST ADVANTAGE certain amounts of money, to be established at trial, that FIRST

16  ADVANTAGE was not legally entitled to receive or that PEI could have applied to set-off damages.

17  The set-off would be appropriate in order to remedy the amount of losses that PEI sustained from

18  FIRST ADVANTAGE's violation of its agreement to not solicit business or disclose confidential and

19  proprietary information.

20         79.    As a direct and proximate result of FIRST ADVANTAGE's failure to perform the

21  aforementioned promise, PEI sustained monetary losses in an amount to be proven at trial, but is

22  approximately $800,000.  Further, based on the aforementioned conduct, PEI has incurred attorneys'

23  fees and costs of bringing this action.  PEI will continue to incur such interest, fees and costs in

24  amounts to be proven at trial.

25         80.    FIRST ADVANTAGE, and on information and belief ROES 1-20, in doing the

26  foregoing, acted with malice, fraud, and/or oppression and therefore punitive damages pursuant to

27  Civil Code §3294 are appropriate.

28  ///

LAW OFFICES OF
MARK R. MITTELMAN
A Professional Corporation
190 NORTH WIGET LANE
SUITE 101
WALNUT CREEK, CA 94598
Phone: (925) 256-0677
FAX: (925) 256-0679

1    WHEREFORE, PEI prays for relief as set forth below.

2                        **EIGHTH CAUSE OF ACTION**

3                          **ACCOUNT STATED**

4                        **[FIRST ADVANTAGE ONLY]**

5    81.  PEI repeats and re-alleges the allegations contained in paragraph 1 through 22, inclusive,

6    above and incorporates the same by reference as though set forth in fill herein.

7    82.  Within the last two years, in Contra Costa County, California, an account was stated in

8    writing by and between PEI and FIRST ADVANTAGE wherein it was acknowledged that FIRST

9    ADVANTAGE was indebted to PEI in the amount of $1,023,683.37.  This indebtedness represented

10   (1) MVR's that FIRST ADVANTAGE did for CCE's, (2) losses attributable to FIRST

11   ADVANTAGE not living up to its promise to allow billings for certain services to be done through

12   PEI, and (3) losses caused by PEI due to the termination its contract with CCE.  A true and correct

13   copy of the evidence of this indebtedness is attached as Exhibit E.

14   83.  Although demand has been made on FIRST ADVANTAGE, no part of said sum has been

15   paid, and there is now due, owing and unpaid to PEI from FIRST ADVANTAGE, the sum of at least

16   $1,023,683.37, plus interest on that amount at the legal rate from and after the date payment was due.

17   84.  PEI has incurred and will continue to incur attorneys' fees and costs in connection with

18   this matter in an amount to be determined at trial.  PEI is entitled to recover its attorneys' fees and

19   costs incurred pursuant to law, including under California Civil Code section 1717.5.

20   WHEREFORE, PEI prays for relief as set forth below.

21                        **NINTH CAUSE OF ACTION**

22              **OPEN BOOK ACCOUNT (COMMON COUNT)**

23                        **[FIRST ADVANTAGE ONLY]**

24   85.  PEI repeats and re-alleges the allegations contained in paragraph 1 through 22, inclusive,

25   above and incorporates the same by reference as though set forth in fill herein.

26   86.  PEI and FIRST ADVANTAGE had financial transactions between them arising from the

27   CCE business services.

28   ///

LAW OFFICES OF
MARK R. MITTELMAN
A Professional Corporation
190 NORTH WIGET LANE
SUITE 101
WALNUT CREEK, CA 94598
Phone: (925) 256-0677
FAX: (925) 256-0679

-17-

FIRST AMENDED  COUNTERCLAIM  Case No. C07-2424 SC

1    87.  PEI kept an account of the debits and credits involved in the financial transactions.

2    88.  FIRST ADVANTAGE owes money on the account in the amount of $1,023,683.37, plus

3    interest on that amount at the legal rate from and after the date payment was due.

4    89.  PEI has incurred and will continue to incur attorneys' fees and costs in connection with

5    this matter in an amount to be determined at trial.  PEI is entitled to recover its attorneys' fees and

6    costs incurred pursuant to law, including under California Civil Code section 1717.5.

7    WHEREFORE, PEI prays for relief as set forth below.

8

9    **PRAYER**

10    WHEREFORE, PEI prays for judgment against FIRST ADVANTAGE and ROES 1-20 as

11    follows:

12    1.    For compensatory damages in the sum of no less than $5 million;

13    2.    For punitive damages pursuant to Civil Code §3294;

14    3.    For disgorgement of profits from FIRST ADVANTAGE;

15    4.    For restitution from FIRST ADVANTAGE;

16    5.    For interest thereon as authorized by law;

17    6.    For reasonable attorneys' fees according to proof as authorized by law;

18    7.    For costs of suit incurred herein; and

19    8.    For such other and further relief as the Court deems just and proper.

20    **DEMAND FOR JURY TRIAL**

21    Pursuant to Federal Rule of Civil Procedure 38 and any other applicable law or rules,

22    PRIVATE EYES, INC. hereby demands trial by jury of all issues so triable.

23    DATED:  October  5, 2007                    LAW OFFICES OF MARK R. MITTELMAN

24

25    _____

26    Mark R. Mittelman
      Attorneys for Defendant/Counter-Claimant/Cross-
27    Complainant
      PRIVATE EYES, INC.

28

LAW OFFICES OF
MARK R. MITTELMAN
A Professional Corporation
190 NORTH WIGET LANE
SUITE 101
WALNUT CREEK, CA 94598
Phone: (925) 256-0677
FAX: (925) 256-0679

-18-

FIRST AMENDED  COUNTERCLAIM  Case No. C07-2424 SC

# EXHIBIT A



**Employee**
**Information**
**Services**

[via email]

March 19, 2002

Ms. Sandra James
Private Eyes, Inc.
700 Ygnacio Valley Road #350
Walnut Creek, CA  94596

Dear Ms. James:

Thank you for taking time today to discuss the opportunities with Coca-Cola.  I am biased, but I believe that Employee Information Services (EI) is uniquely able to partner with Private Eyes for this relationship and hopefully many others.  Due to the relative speed in which this opportunity is developing, I believe it is worth documenting some of what has been discussed and agreed to at this point.  Therefore, please consider this letter as a Letter of Understanding (LOU) and a work in process.  For the purposes of this letter and in respect to time, this LOU applies for Coca-Cola but can be expanded at any time to address other prospects or current clients of Private Eyes and EI.

**Business Relationship:**

It is EI's understanding that Coca-Cola has contracted with Private Eyes for background screens and drug screening.  Private Eyes is seeking a partner to provide drug screening services directly to Coca-Cola.  Therefore, EI will provide complete support and services for drug screening directly to Coca-Cola.

As a result of this relationship and for the purposes of developing a partnership relationship with Private Eyes, Coca-Cola and possibly other clients, EI will agree not to directly solicit Coca-Cola for any of the services provided by Private Eyes unless EI receives the written consent of Private Eyes.  In return, Private Eyes will agree not to directly solicit Coca-Cola for any of the services that are provided by EI unless Private Eyes receives the written consent of EI.

The parties realize that the success of the Coca-Cola relationship is dependant on the satisfactory performance of both of the service components of the contract.  Private Eyes reserves the right to cancel subcontract with EIS if Coca-Cola expresses dissatisfaction with the performance of EIS and EIS is unable to correct any performance deficiencies within 30 days of formal or informal notice from Coca-Cola of such dissatisfaction.

## Invoicing

Since Coca-Cola's contract for services is with Private Eyes, Private Eyes will be responsible for unified invoicing to the client. Therefore, EI will agree to and provide data to Private Eyes to import into their financial package to generate appropriate invoicing. Specifications and methods of interfacing billing data will be agreed to at a later time.

## Pricing

EI offers Private Eyes the following pricing for services to be provided to Coca-Cola.

"In Network" Drug Screening                                   $23.00 per test
- Source in-network collection facilities
- Set up in-network collection facilities
- Complete urine specimen collection
- Set up laboratory accounts
- Order laboratory supplies
- Complete laboratory analysis
- Order pre-printed Custody and Control Forms
- Oversee Medical Review Officer services
- Report results
- Store records
- Consolidate urine collection, laboratory, MRO and program management fees

"Out of Network" Drug Screening                              $41.00 per test
- Source out of network collection facilities
- Set up out of network collection facilities
- Complete urine specimen collection
- Set up laboratory accounts
- Order laboratory supplies
- Complete laboratory analysis
- Order pre-printed Custody and Control Forms
- Oversee Medical Review Officer services
- Report results
- Store records
- Consolidate urine collection, laboratory, MRO and program management fees

Mobile/After-Hours Services:                                 see below
- Coordination for the collection of mobile/post-accident tests performed at $100/hour (one-hour minimum) plus the actual cost of the collection
- Mobile charges (which are based on mileage, wait time, number of people tested, tests performed and other applicable charges) passed through at cost

Please note that EI has additional services that can be quoted at a future time including:

    DOT or Non-DOT physicals scheduling, review, and compliance
    Medical Consultation and return to duty evaluation
    Employee Assistance Programs (EAP)

       Follow up testing / rehabilitation management
       Policy development
       Records Management (Driver files, compliance checks, etc)

**Payments and Rebates**

       EI's billing data to Private Eyes will be at the rates listed above. Alternately, EI's bill to Private Eyes can be at a reduced rate and Private Eyes can "mark up" the amount for invoicing to the client.

       It is EI's understanding that CocaCola will be offered a 3% discount (based on $23.00 actual cost of goods) for any invoices paid to Private Eyes less than net-15. Accordingly, EI will offer Private Eyes a 3% discount for any invoice paid to EI net-22 or less.

**Future Agreements**

       It is understood and agreed to by both EI and Private Eyes that there may be additional agreements and / or contracts to formalize this or other business initiatives. Therefore, this LOU may be superceded.

Sandra, in the brief conversations that we have had to date, it is obvious that both of our companies have similar goals and priorities on service, value add, and mutually beneficial relationships. EI strives to infuse integrity and ingenuity into an industry that is plagued with border-line business practices. I am confident that as we continue to develop our abilities to partner together, our companies and our clients will benefit from our efforts.

Please do not hesitate to contact me. I look forward to working with you and your organization. To formalize our understandings and intents, if you find this LOU agreeable, please sign and return a copy to me.

Best Regards,

Todd Oliver

Todd Oliver
Employee Information Services

Agreed to by:

Sandra James
Private Eyes Incorporated

Date 3/29/02

# EXHIBIT B



*First Advantage*
C O R P O R A T I O N

October 8, 2003

Sandra James
President
Private Eyes, Inc.
190 N. Wiget Lane #220
Walnut Creek, CA 94598

Dear Ms. James:

In connection with the pending transaction between First Advantage Corporation and Employee Information Systems, Inc. (EIS), First Advantage and Private Eyes desire to enter into this letter agreement ("Agreement") setting forth the parties understanding regarding Private Eyes customer information learned as a result of (i) Private Eyes' use EIS's drug screening services or (ii) future use of First Advantage's drug screening services, which may include EIS. For the purposes of this Agreement information Private Eyes discloses to First Advantage, including its client names, contacts and pricing, shall be deemed "Confidential Information."

Confidential Information disclosed by Private Eyes to First Advantage may only be used for the purpose of First Advantage providing drug screening services to Private Eyes' customers. First Advantage shall hold the Confidential Information in confidence and agrees to use the same degree of care it uses to protect its own confidential information, but in no event less than a reasonable standard of care.

First Advantage may not disclose Confidential Information to: (i) any of its employees or business representatives unless they have a need to know such information to carry out the pending transaction between First Advantage and EIS, (ii) any of its employees or agents for the purpose of providing employment background screening services, which shall exclude drug screening for the purpose of this Agreement, (iii) any third parties that are not providing consultation with regard to the pending transaction, (iv) any third parties unless they need the Confidential Information for the purpose of providing drug screenings services to Private Eyes.

First Advantage represents that it will not use Confidential Information obtained from Private Eyes to, intentionally solicit, endeavor to entice away from, or otherwise interfere with the relationship Private Eyes has with any of its employment background screening customers, clients, suppliers or other entity with whom they do business, based on the Confidential Information. First Advantage may not use the Confidential Information for sales and marketing efforts to its existing or prospective employment background screening customers.

In exchange for First Advantage's agreement not to use Confidential Information as stated, Private Eyes agrees to use First Advantage's drug screening services as its exclusive drug screening provider during the term of this Agreement. Additionally, in exchange for Private Eyes agreeing to use First Advantage as its sole drug screening provider, First Advantage agrees that it will not intentionally solicit, endeavor to entice away from, or otherwise interfere with the relationship Private Eyes has with Coca Cola, Inc.

In some cases, First Advantage or one of its subsidiary companies may have the need to disclose its confidential information to Private Eyes ("FADV Confidential Information"). FADV Confidential Information may include but is not limited to client lists, marketing or sales plans, methodologies, business plans, financial information, trade secrets, know-how and such other information as may be marked from time-to-time. Private Eyes shall hold FADV Confidential Information in confidence and shall not disclose it to any third parties without the express written consent of First Advantage. Private Eyes agrees to use the

same degree of care it uses to protect its own confidential information, but in no event less than a reasonable standard of care.

The term "Confidential Information" or "FADV Confidential Information" does not include any information which the receiving party can demonstrate: (i) is at the time of disclosure is in the public domain or which after such disclosure comes into the public domain through no fault First Advantage or its representatives; (ii) was available to First Advantage on a non-confidential basis from a source other than Private Eyes or EIS, or their respective officers, directors, employees, or advisors, provided that such source is not and was not bound by a confidentiality agreement with Private Eyes; (iii) has been released without restriction Private Eyes to another person not covered by an agreement similar in terms to this agreement; (iv) is required to be disclosed by applicable law or regulation, but only to the extent and for the purposes of such required disclosure; or (v) is required to be disclosed by a valid order of a court or government agency with appropriate jurisdiction over the parties and the subject matter of the information, but only to the extent of and for the purposes of such order and only after the other party is afforded a reasonable opportunity to oppose such order or seek protection for further disclosure of the information.

Each party's Confidential Information (which for the purpose of this paragraph shall include FADV Confidential Information) is and will remain its sole property. Neither party obtains any ownership or license interest in any of the other's Confidential Information by virtue of its disclosure under this Agreement. Each party will return to or destroy the other all of the other's Confidential Information in its possession or control upon the expiration or termination of this Agreement. The disclosure of Confidential Information hereunder shall not be construed as granting any license to or right or ownership in the Confidential Information.

The parties acknowledge that the harm caused by the wrongful disclosure of Confidential Information and/or FADV Confidential Information will be difficult, if not impossible, to assess on a monetary basis alone, and that legal damages may not be sufficient compensation for such wrongful disclosure. Therefore, either party may enforce this Agreement by equitable means, including, but not limited to, injunctive relief, in addition to any other remedies to which it is otherwise entitled.

The term of this Agreement shall be for three (3) years from the date written above.

Neither party will assign their respective rights or duties under this Agreement to another without the prior express written consent of the other party, which consent shall not be unreasonably withheld or delayed. Any other purported assignment will be void.

This Agreement will be governed by and construed in accordance with the laws of the State of California. The parties agree to resolve any disputes arising from the terms of this agreement by arbitration, with such arbitration to be held in Contra Costa County, California.

All billing for drug screening services will continue to be made directly through Private Eyes and processed solely by them.

This Agreement represents the entire understanding between the parties with respect to the subject matter herein. The terms of this Agreement shall be binding upon and inure to the benefit of the parties and to their legal representatives and successors. No waiver, alteration or modification of any of the provisions of this Agreement shall be binding unless in writing and signed by a duly authorized representative of the parties.

If these terms meet with your understanding than please acknowledge your acceptance by countersigning below.

Sincerely,

Richard Heitzmann
Vice President, Corporate Development Officer

Agreed to and Accepted by:

Sandra James

# EXHIBIT C

LAW OFFICES OF
### TERENCE DANIEL DOYLE
A PROFESSIONAL CORPORATION
571 Hartz Avenue
Danville, CA 94526
925-855-4330 (Telephone)
925-855-4344 (Facsimile)

Terence Daniel Doyle*‡ LL.M. Taxation
Michael LaMay
Ron Maidenberg
David J. Golde
R. Joseph Shatzko
Richard D. Grossman

WRITER'S DIRECT DIAL NUMBER
925-314-2320

‡ Licensed in California, Arizona and Hawaii

July 2, 2004

Bart Valdez
First Advantage Corporation
805 Executive Center Drive West, Suite 300
St. Petersburg, FL 33702

   *Re: Private Eyes, Inc.*

Dear Mr. Valdez:

   During a conference call on April 27, 2004 we reached an agreement regarding compensation payable to Private Eyes, Inc. (PEI) from First Advantage Corporation (FAC) resulting from PEI's loss of annual Coca Cola Enterprises (CCE) MVR business to FAC.

   FAC was to pay PEI $1.80 for every MVR pulled by FAC for CCE monthly, payable within thirty (30) days of the end of the month, starting with the month of March 2004. FAC was also to provide PEI with regular reports showing CCE MVR activity. No payments have been received thus far and no reports have been shared.

   Please ask whoever should be processing the payment and generating the reports to do so forthwith. Thank you for your intervention in this regard.

                              Very truly yours,

                              LAW OFFICES OF TERENCE DANIEL DOYLE

                              Terence Daniel Doyle, Esq.

cc: Sandra James, President, Private Eyes, Inc.

Via Fed Ex

# EXHIBIT E

Accrual Basis

| Type | Date | Num | Memo | Due Date | Open Balance | Amount |
|------|------|-----|------|----------|-------------|--------|
| **First Advantage Corporation** | | | | | | |
| Invoice | 5/31/2005 | 233 | | 5/31/2005 | 655.00 | 655.00 |
| Invoice | 6/30/2005 | 234 | | 6/30/2005 | 3,595.00 | 3,595.00 |
| Invoice | 7/31/2005 | 235 | | 7/31/2005 | 3,725.00 | 3,725.00 |
| Invoice | 7/31/2005 | 236 | | 7/31/2005 | 6,285.00 | 6,285.00 |
| Invoice | 7/31/2005 | 244 | JULY MVR | 7/31/2005 | 7,578.00 | 7,578.00 |
| Invoice | 8/31/2005 | 245 | | 8/31/2005 | 7,578.00 | 7,578.00 |
| Invoice | 9/30/2005 | 237 | | 9/30/2005 | 2,840.00 | 2,840.00 |
| Invoice | 9/30/2005 | 246 | SEPTEMBE... | 9/30/2005 | 7,578.00 | 7,578.00 |
| Invoice | 10/31/2005 | 238 | | 10/31/2005 | 4,170.00 | 4,170.00 |
| Invoice | 10/31/2005 | 247 | OCTOBER M... | 10/31/2005 | 7,578.00 | 7,578.00 |
| Invoice | 11/30/2005 | 239 | | 11/30/2005 | 3,805.00 | 3,805.00 |
| Invoice | 11/30/2005 | 248 | OCTOBER M... | 11/30/2005 | 7,578.00 | 7,578.00 |
| Invoice | 12/31/2005 | 240 | | 12/31/2005 | 3,515.00 | 3,515.00 |
| Invoice | 12/31/2005 | 249 | | 12/31/2005 | 7,578.00 | 7,578.00 |
| Invoice | 1/1/2006 | 262 | | 1/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 1/31/2006 | 241 | | 1/31/2006 | 4,580.00 | 4,580.00 |
| Invoice | 2/1/2006 | 263 | | 2/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 2/28/2006 | 242 | | 2/28/2006 | 4,080.00 | 4,080.00 |
| Invoice | 3/1/2006 | 264 | | 3/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 3/31/2006 | 243 | | 3/31/2006 | 3,700.00 | 3,700.00 |
| Invoice | 4/1/2006 | 265 | | 4/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 5/1/2006 | 266 | | 5/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 6/1/2006 | 268 | | 6/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 7/1/2006 | 269 | | 7/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 8/1/2006 | 270 | | 8/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 8/7/2006 | 220 | JULY 2006 | 8/7/2006 | 3,645.00 | 3,645.00 |
| Invoice | 8/7/2006 | 221 | JUNE 2006 | 8/7/2006 | 3,585.00 | 3,585.00 |
| Invoice | 8/7/2006 | 222 | JUNE 2006 | 8/7/2006 | 3,585.00 | 3,585.00 |
| Invoice | 8/7/2006 | 223 | MAY 2006 | 8/7/2006 | 4,195.00 | 4,195.00 |
| Invoice | 8/7/2006 | 224 | APRIL 2006 | 8/7/2006 | 5,250.00 | 5,250.00 |
| Invoice | 8/7/2006 | 225 | MARCH 2006 | 8/7/2006 | 3,700.00 | 3,700.00 |
| Invoice | 8/7/2006 | 226 | FEBRUARY ... | 8/7/2006 | 4,080.00 | 4,080.00 |
| Invoice | 9/1/2006 | 271 | | 9/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 9/6/2006 | 230 | August 2006 ... | 9/6/2006 | 4,230.00 | 4,230.00 |
| Invoice | 9/30/2006 | 261 | | 9/30/2006 | 3,970.00 | 3,970.00 |
| Invoice | 10/1/2006 | 272 | | 10/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 10/31/2006 | 260 | | 10/31/2006 | 3,400.00 | 3,400.00 |
| Invoice | 11/1/2006 | 273 | | 11/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 12/1/2006 | 278 | | 12/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 12/1/2006 | 279 | | 12/1/2006 | 3,805.00 | 3,805.00 |
| Invoice | 12/1/2006 | 282 | | 12/1/2006 | 294,122.87 | 294,122.87 |
| Invoice | 1/1/2007 | 277 | | 1/1/2007 | 4,350.00 | 4,350.00 |
| Invoice | 1/1/2007 | 280 | | 1/1/2007 | 3,515.00 | 3,515.00 |
| Invoice | 1/1/2007 | 281 | | 1/1/2007 | 243,021.99 | 243,021.99 |
| Invoice | 2/1/2007 | 274 | | 2/1/2007 | 4,350.00 | 4,350.00 |
| Invoice | 2/1/2007 | 275 | | 2/1/2007 | 4,595.00 | 4,595.00 |
| Invoice | 2/1/2007 | 276 | | 2/1/2007 | 287,685.51 | 287,685.51 |
| Total First Advantage Corporation | | | | | 1,023,683.37 | 1,023,683.37 |
| **TOTAL** | | | | | 1,023,683.37 | 1,023,683.37 |

# EXHIBIT E

All Transactions

| Type | Date | Num | Memo | Due Date | Open Balance | Amount |
|------|------|-----|------|----------|--------------|--------|
| **First Advantage Corporation** | | | | | | |
| Invoice | 5/31/2005 | 233 | | 5/31/2005 | 655.00 | 655.00 |
| Invoice | 6/30/2005 | 234 | | 6/30/2005 | 3,595.00 | 3,595.00 |
| Invoice | 7/31/2005 | 235 | | 7/31/2005 | 3,725.00 | 3,725.00 |
| Invoice | 7/31/2005 | 236 | | 7/31/2005 | 6,285.00 | 6,285.00 |
| Invoice | 7/31/2005 | 244 | JULY MVR | 7/31/2005 | 7,578.00 | 7,578.00 |
| Invoice | 8/31/2005 | 245 | | 8/31/2005 | 7,578.00 | 7,578.00 |
| Invoice | 9/30/2005 | 237 | | 9/30/2005 | 2,840.00 | 2,840.00 |
| Invoice | 9/30/2005 | 246 | SEPTEMBE... | 9/30/2005 | 7,578.00 | 7,578.00 |
| Invoice | 10/31/2005 | 238 | | 10/31/2005 | 4,170.00 | 4,170.00 |
| Invoice | 10/31/2005 | 247 | OCTOBER M... | 10/31/2005 | 7,578.00 | 7,578.00 |
| Invoice | 11/30/2005 | 239 | | 11/30/2005 | 3,805.00 | 3,805.00 |
| Invoice | 11/30/2005 | 248 | OCTOBER M... | 11/30/2005 | 7,578.00 | 7,578.00 |
| Invoice | 12/31/2005 | 240 | | 12/31/2005 | 3,515.00 | 3,515.00 |
| Invoice | 12/31/2005 | 249 | | 12/31/2005 | 7,578.00 | 7,578.00 |
| Invoice | 1/1/2006 | 262 | | 1/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 1/31/2006 | 241 | | 1/31/2006 | 4,580.00 | 4,580.00 |
| Invoice | 2/1/2006 | 263 | | 2/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 2/28/2006 | 242 | | 2/28/2006 | 4,080.00 | 4,080.00 |
| Invoice | 3/1/2006 | 264 | | 3/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 3/31/2006 | 243 | | 3/31/2006 | 3,700.00 | 3,700.00 |
| Invoice | 4/1/2006 | 265 | | 4/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 5/1/2006 | 266 | | 5/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 6/1/2006 | 268 | | 6/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 7/1/2006 | 269 | | 7/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 8/1/2006 | 270 | | 8/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 8/7/2006 | 220 | JULY 2006 | 8/7/2006 | 3,645.00 | 3,645.00 |
| Invoice | 8/7/2006 | 221 | JUNE 2006 | 8/7/2006 | 3,585.00 | 3,585.00 |
| Invoice | 8/7/2006 | 222 | JUNE 2006 | 8/7/2006 | 3,585.00 | 3,585.00 |
| Invoice | 8/7/2006 | 223 | MAY 2006 | 8/7/2006 | 4,195.00 | 4,195.00 |
| Invoice | 8/7/2006 | 224 | APRIL 2006 | 8/7/2006 | 5,250.00 | 5,250.00 |
| Invoice | 8/7/2006 | 225 | MARCH 2006 | 8/7/2006 | 3,700.00 | 3,700.00 |
| Invoice | 8/7/2006 | 226 | FEBRUARY ... | 8/7/2006 | 4,080.00 | 4,080.00 |
| Invoice | 9/1/2006 | 271 | | 9/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 9/6/2006 | 230 | August 2006 ... | 9/6/2006 | 4,230.00 | 4,230.00 |
| Invoice | 9/30/2006 | 261 | | 9/30/2006 | 3,970.00 | 3,970.00 |
| Invoice | 10/1/2006 | 272 | | 10/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 10/31/2006 | 260 | | 10/31/2006 | 3,400.00 | 3,400.00 |
| Invoice | 11/1/2006 | 273 | | 11/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 12/1/2006 | 278 | | 12/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 12/1/2006 | 279 | | 12/1/2006 | 3,805.00 | 3,805.00 |
| Invoice | 12/1/2006 | 282 | | 12/1/2006 | 294,122.87 | 294,122.87 |
| Invoice | 1/1/2007 | 277 | | 1/1/2007 | 4,350.00 | 4,350.00 |
| Invoice | 1/1/2007 | 280 | | 1/1/2007 | 3,515.00 | 3,515.00 |
| Invoice | 1/1/2007 | 281 | | 1/1/2007 | 243,021.99 | 243,021.99 |
| Invoice | 2/1/2007 | 274 | | 2/1/2007 | 4,350.00 | 4,350.00 |
| Invoice | 2/1/2007 | 275 | | 2/1/2007 | 4,595.00 | 4,595.00 |
| Invoice | 2/1/2007 | 276 | | 2/1/2007 | 287,685.51 | 287,685.51 |
| Total First Advantage Corporation | | | | | 1,023,683.37 | 1,023,683.37 |
| **TOTAL** | | | | | 1,023,683.37 | 1,023,683.37 |