# EXHIBIT A



Employee Information Services

[via email]

March 19, 2002

Ms. Sandra James
Private Eyes, Inc.
700 Ygnacio Valley Road #350
Walnut Creek, CA 94596

Dear Ms. James:

Thank you for taking time today to discuss the opportunities with Coca-Cola. I am biased, but I believe that Employee Information Services (EI) is uniquely able to partner with Private Eyes for this relationship and hopefully many others. Due to the relative speed in which this opportunity is developing, I believe it is worth documenting some of what has been discussed and agreed to at this point. Therefore, please consider this letter as a Letter of Understanding (LOU) and a work in process. For the purposes of this letter and in respect to time, this LOU applies for Coca-Cola but can be expanded at any time to address other prospects or current clients of Private Eyes and EI.

**Business Relationship:**

It is EI's understanding that Coca-Cola has contracted with Private Eyes for background screens and drug screening. Private Eyes is seeking a partner to provide drug screening services directly to Coca-Cola. Therefore, EI will provide complete support and services for drug screening directly to Coca-Cola.

As a result of this relationship and for the purposes of developing a partnership relationship with Private Eyes, Coca-Cola and possibly other clients, EI will agree not to directly solicit Coca-Cola for any of the services provided by Private Eyes unless EI receives the written consent of Private Eyes. In return, Private Eyes will agree not to directly solicit Coca-Cola for any of the services that are provided by EI unless Private Eyes receives the written consent of EI.

The parties realize that the success of the Coca-Cola relationship is dependant on the satisfactory performance of both of the service components of the contract. Private Eyes reserves the right to cancel subcontract with EIS if Coca-Cola expresses dissatisfaction with the performance of EIS and EIS is unable to correct any performance deficiencies within 30 days of formal or informal notice from Coca-Cola of such dissatisfaction.

Invoicing

Since Coca-Cola's contract for services is with Private Eyes, Private Eyes will be responsible for unified invoicing to the client. Therefore, EI will agree to and provide data to Private Eyes to import into their financial package to generate appropriate invoicing. Specifications and methods of interfacing billing data will be agreed to at a later time.

Pricing

EI offers Private Eyes the following pricing for services to be provided to Coca-Cola.

"In Network" Drug Screening                $23.00 per test
- Source in-network collection facilities
- Set up in-network collection facilities
- Complete urine specimen collection
- Set up laboratory accounts
- Order laboratory supplies
- Complete laboratory analysis
- Order pre-printed Custody and Control Forms
- Oversee Medical Review Officer services
- Report results
- Store records
- Consolidate urine collection, laboratory, MRO and program management fees

"Out of Network" Drug Screening            $41.00 per test
- Source out of network collection facilities
- Set up out of network collection facilities
- Complete urine specimen collection
- Set up laboratory accounts
- Order laboratory supplies
- Complete laboratory analysis
- Order pre-printed Custody and Control Forms
- Oversee Medical Review Officer services
- Report results
- Store records
- Consolidate urine collection, laboratory, MRO and program management fees

Mobile/After-Hours Services:               see below
- Coordination for the collection of mobile/post-accident tests performed at $100/hour (one-hour minimum) plus the actual cost of the collection
- Mobile charges (which are based on mileage, wait time, number of people tested, tests performed and other applicable charges) passed through at cost

Please note that EI has additional services that can be quoted at a future time including:
   DOT or Non-DOT physicals scheduling, review, and compliance
   Medical Consultation and return to duty evaluation
   Employee Assistance Programs (EAP)

Follow up testing / rehabilitation management
Policy development
Records Management (Driver files, compliance checks, etc)

**Payments and Rebates**
EI's billing data to Private Eyes will be at the rates listed above. Alternately, EI's bill to Private Eyes can be at a reduced rate and Private Eyes can "mark up" the amount for invoicing to the client.

It is EI's understanding that CocaCola will be offered a 3% discount (based on $23.00 actual cost of goods) for any invoices paid to Private Eyes less than net-15. Accordingly, EI will offer Private Eyes a 3% discount for any invoice paid to EI net-22 or less.

**Future Agreements**
It is understood and agreed to by both EI and Private Eyes that there may be additional agreements and / or contracts to formalize this or other business initiatives. Therefore, this LOU may be superceded.

Sandra, in the brief conversations that we have had to date, it is obvious that both of our companies have similar goals and priorities on service, value add, and mutually beneficial relationships. EI strives to infuse integrity and ingenuity into an industry that is plagued with border-line business practices. I am confident that as we continue to develop our abilities to partner together, our companies and our clients will benefit from our efforts.

Please do not hesitate to contact me. I look forward to working with you and your organization. To formalize our understandings and intents, if you find this LOU agreeable, please sign and return a copy to me.

Best Regards,

Todd Oliver

Todd Oliver
Employee Information Services

Agreed to by:

Sandra James
Private Eyes Incorporated

Date 3/29/02

# EXHIBIT B



October 8, 2003

Sandra James
President
Private Eyes, Inc.
190 N. Wiget Lane #220
Walnut Creek, CA 94598

Dear Ms. James:

In connection with the pending transaction between First Advantage Corporation and Employee Information Systems, Inc. (EIS), First Advantage and Private Eyes desire to enter into this letter agreement ("Agreement") setting forth the parties understanding regarding Private Eyes customer information learned as a result of (i) Private Eyes' use EIS's drug screening services or (ii) future use of First Advantage's drug screening services, which may include EIS. For the purposes of this Agreement information Private Eyes discloses to First Advantage, including its client names, contacts and pricing, shall be deemed "Confidential Information."

Confidential Information disclosed by Private Eyes to First Advantage may only be used for the purpose of First Advantage providing drug screening services to Private Eyes' customers. First Advantage shall hold the Confidential Information in confidence and agrees to use the same degree of care it uses to protect its own confidential information, but in no event less than a reasonable standard of care.

First Advantage may not disclose Confidential Information to: (i) any of its employees or business representatives unless they have a need to know such Information to carry out the pending transaction between First Advantage and EIS, (ii) any of its employees or agents for the purpose of providing employment background screening services, which shall exclude drug screening for the purpose of this Agreement, (iii) any third parties that are not providing consultation with regard to the pending transaction, (iv) any third parties unless they need the Confidential Information for the purpose of providing drug screenings services to Private Eyes.

First Advantage represents that it will not use Confidential Information obtained from Private Eyes to, intentionally solicit, endeavor to entice away from, or otherwise interfere with the relationship Private Eyes has with any of its employment background screening customers, clients, suppliers or other entity with whom they do business, based on the Confidential Information. First Advantage may not use the Confidential Information for sales and marketing efforts to its existing or prospective employment background screening customers.

In exchange for First Advantage's agreement not to use Confidential Information as stated, Private Eyes agrees to use First Advantage's drug screening services as its exclusive drug screening provider during the term of this Agreement. Additionally, in exchange for Private Eyes agreeing to use First Advantage as its sole drug screening provider, First Advantage agrees that it will not intentionally solicit, endeavor to entice away from, or otherwise interfere with the relationship Private Eyes has with Coca Cola, Inc.

In some cases, First Advantage or one of its subsidiary companies may have the need to disclose its confidential information to Private Eyes ("FADV Confidential Information"). FADV Confidential Information may include but is not limited to client lists, marketing or sales plans, methodologies, business plans, financial information, trade secrets, know-how and such other information as may be marked from time-to-time. Private Eyes shall hold FADV Confidential Information in confidence and shall not disclose it to any third parties without the express written consent of First Advantage. Private Eyes agrees to use the

same degree of care it uses to protect its own confidential information, but in no event less than a reasonable standard of care.

The term "Confidential Information" or "FADV Confidential Information" does not include any information which the receiving party can demonstrate: (i) is at the time of disclosure is in the public domain or which after such disclosure comes into the public domain through no fault First Advantage or its representatives; (ii) was available to First Advantage on a non-confidential basis from a source other than Private Eyes or EIS, or their respective officers, directors, employees, or advisors, provided that such source is not and was not bound by a confidentiality agreement with Private Eyes; (iii) has been released without restriction Private Eyes to another person not covered by an agreement similar in terms to this agreement; (iv) is required to be disclosed by applicable law or regulation, but only to the extent and for the purposes of such required disclosure; or (v) is required to be disclosed by a valid order of a court or government agency with appropriate jurisdiction over the parties and the subject matter of the information, but only to the extent of and for the purposes of such order and only after the other party is afforded a reasonable opportunity to oppose such order or seek protection for further disclosure of the information.

Each party's Confidential Information (which for the purpose of this paragraph shall include FADV Confidential Information) is and will remain its sole property. Neither party obtains any ownership or license interest in any of the other's Confidential Information by virtue of its disclosure under this Agreement. Each party will return to or destroy the other all of the other's Confidential Information in its possession or control upon the expiration or termination of this Agreement. The disclosure of Confidential Information hereunder shall not be construed as granting any license to or right or ownership in the Confidential Information.

The parties acknowledge that the harm caused by the wrongful disclosure of Confidential Information and/or FADV Confidential Information will be difficult, if not impossible, to assess on a monetary basis alone, and that legal damages may not be sufficient compensation for such wrongful disclosure. Therefore, either party may enforce this Agreement by equitable means, including, but not limited to, injunctive relief, in addition to any other remedies to which it is otherwise entitled.

The term of this Agreement shall be for three (3) years from the date written above.

Neither party will assign their respective rights or duties under this Agreement to another without the prior express written consent of the other party, which consent shall not be unreasonably withheld or delayed. Any other purported assignment will be void.

This Agreement will be governed by and construed in accordance with the laws of the State of California. The parties agree to resolve any disputes arising from the terms of this agreement by arbitration, with such arbitration to be held in Contra Costa County, California.

All billing for drug screening services will continue to be made directly through Private Eyes and processed solely by them.

This Agreement represents the entire understanding between the parties with respect to the subject matter herein. The terms of this Agreement shall be binding upon and inure to the benefit of the parties and to their legal representatives and successors. No waiver, alteration or modification of any of the provisions of this Agreement shall be binding unless in writing and signed by a duly authorized representative of the parties.

If these terms meet with your understanding than please acknowledge your acceptance by countersigning below.

Sincerely,

Richard Heitzmann
Vice President, Corporate Development Officer

Agreed to and Accepted by:

Sandra James

# EXHIBIT C

LAW OFFICES OF
**TERENCE DANIEL DOYLE**
A PROFESSIONAL CORPORATION
571 Hartz Avenue
Danville, CA 94526
925-855-4330 (Telephone)
925-855-4344 (Facsimile)

Terence Daniel Doyle*‡ LL.M. Taxation
Michael LaMay
Ron Maidenberg
David J. Golde
R. Joseph Shatzko
Richard D. Grossman

‡ Licensed in California, Arizona and Hawaii

WRITER'S DIRECT DIAL NUMBER
925-314-2320

July 2, 2004

Bart Valdez
First Advantage Corporation
805 Executive Center Drive West, Suite 300
St. Petersburg, FL 33702

*Re: Private Eyes, Inc.*

Dear Mr. Valdez:

During a conference call on April 27, 2004 we reached an agreement regarding compensation payable to Private Eyes, Inc. (PEI) from First Advantage Corporation (FAC) resulting from PEI's loss of annual Coca Cola Enterprises (CCE) MVR business to FAC.

FAC was to pay PEI $1.80 for every MVR pulled by FAC for CCE monthly, payable within thirty (30) days of the end of the month, starting with the month of March 2004. FAC was also to provide PEI with regular reports showing CCE MVR activity. No payments have been received thus far and no reports have been shared.

Please ask whoever should be processing the payment and generating the reports to do so forthwith. Thank you for your intervention in this regard.

Very truly yours,

LAW OFFICES OF TERENCE DANIEL DOYLE

Terence Daniel Doyle, Esq.

cc: Sandra James, President, Private Eyes, Inc.

VIA Fed Ex

# EXHIBIT E

PTI, a division of Pribuss Eyen, Inc.
## Customer Open Balance
### All Transactions

| Type | Date | Num | Memo | Due Date | Open Balance | Amount |
|---|---|---|---|---|---|---|
| **First Advantage Corporation** | | | | | | |
| Invoice | 5/31/2005 | 233 | | 5/31/2005 | 655.00 | 655.00 |
| Invoice | 6/30/2005 | 234 | | 6/30/2005 | 3,585.00 | 3,585.00 |
| Invoice | 7/31/2005 | 235 | | 7/31/2005 | 3,725.00 | 3,725.00 |
| Invoice | 7/31/2005 | 236 | | 7/31/2005 | 6,285.00 | 6,285.00 |
| Invoice | 7/31/2005 | 244 | JULY MVR | 7/31/2005 | 7,578.00 | 7,578.00 |
| Invoice | 8/31/2005 | 245 | | 8/31/2005 | 7,578.00 | 7,578.00 |
| Invoice | 9/30/2005 | 237 | | 9/30/2005 | 2,340.00 | 2,340.00 |
| Invoice | 9/30/2005 | 246 | SEPTEMBE... | 9/30/2005 | 7,578.00 | 7,578.00 |
| Invoice | 10/31/2005 | 238 | | 10/31/2005 | 4,170.00 | 4,170.00 |
| Invoice | 10/31/2005 | 247 | OCTOBER M... | 10/31/2005 | 7,578.00 | 7,578.00 |
| Invoice | 11/30/2005 | 239 | | 11/30/2005 | 3,805.00 | 3,805.00 |
| Invoice | 11/30/2005 | 248 | OCTOBER M... | 11/30/2005 | 7,578.00 | 7,578.00 |
| Invoice | 12/31/2005 | 240 | | 12/31/2005 | 3,515.00 | 3,515.00 |
| Invoice | 12/31/2005 | 249 | | 12/31/2005 | 7,578.00 | 7,578.00 |
| Invoice | 1/1/2006 | 262 | | 1/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 1/31/2006 | 241 | | 1/31/2006 | 4,580.00 | 4,580.00 |
| Invoice | 2/1/2006 | 263 | | 2/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 2/28/2006 | 242 | | 2/28/2006 | 4,080.00 | 4,080.00 |
| Invoice | 3/1/2006 | 264 | | 3/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 3/31/2006 | 243 | | 3/31/2006 | 3,700.00 | 3,700.00 |
| Invoice | 4/1/2006 | 265 | | 4/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 5/1/2006 | 266 | | 5/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 6/1/2006 | 268 | | 6/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 7/1/2006 | 269 | | 7/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 8/1/2006 | 270 | | 8/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 8/7/2006 | 220 | JULY 2006 | 8/7/2006 | 3,645.00 | 3,645.00 |
| Invoice | 8/7/2006 | 221 | JUNE 2006 | 8/7/2006 | 3,585.00 | 3,585.00 |
| Invoice | 8/7/2006 | 222 | JUNE 2006 | 8/7/2006 | 3,585.00 | 3,585.00 |
| Invoice | 8/7/2006 | 223 | MAY 2006 | 8/7/2006 | 4,195.00 | 4,195.00 |
| Invoice | 8/7/2006 | 224 | APRIL 2006 | 8/7/2006 | 5,250.00 | 5,250.00 |
| Invoice | 8/7/2006 | 225 | MARCH 2006 | 8/7/2006 | 3,700.00 | 3,700.00 |
| Invoice | 8/7/2006 | 226 | FEBRUARY ... | 8/7/2006 | 4,080.00 | 4,080.00 |
| Invoice | 9/1/2006 | 271 | | 9/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 9/6/2006 | 230 | August 2006 ... | 9/6/2006 | 4,230.00 | 4,230.00 |
| Invoice | 9/30/2006 | 261 | | 9/30/2006 | 3,970.00 | 3,970.00 |
| Invoice | 10/1/2006 | 272 | | 10/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 10/31/2006 | 260 | | 10/31/2006 | 3,400.00 | 3,400.00 |
| Invoice | 11/1/2006 | 273 | | 11/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 12/1/2006 | 278 | | 12/1/2006 | 4,350.00 | 4,350.00 |
| Invoice | 12/1/2006 | 279 | | 12/1/2006 | 3,805.00 | 3,805.00 |
| Invoice | 12/1/2006 | 282 | | 12/1/2006 | 294,122.87 | 294,122.87 |
| Invoice | 1/1/2007 | 277 | | 1/1/2007 | 4,350.00 | 4,350.00 |
| Invoice | 1/1/2007 | 280 | | 1/1/2007 | 3,515.00 | 3,515.00 |
| Invoice | 1/1/2007 | 281 | | 1/1/2007 | 243,021.99 | 243,021.99 |
| Invoice | 2/1/2007 | 274 | | 2/1/2007 | 4,350.00 | 4,350.00 |
| Invoice | 2/1/2007 | 275 | | 2/1/2007 | 4,595.00 | 4,595.00 |
| Invoice | 2/1/2007 | 276 | | 2/1/2007 | 287,665.51 | 287,665.51 |
| **Total First Advantage Corporation** | | | | | **1,023,683.37** | **1,023,683.37** |
| **TOTAL** | | | | | **1,023,683.37** | **1,023,683.37** |