RICHARD T. WHITE #58622
WILLIAM E. ADAMS #153330
SARA N. PASQUINELLI
FITZGERALD ABBOTT & BEARDSLEY LLP
1221 Broadway, 21st Floor
Oakland, California 94612
Telephone: (510) 451-3300
Facsimile: (510) 451-1527
Email: rwhite@fablaw.com; wadams@fablaw.com;
spasquinelli@fablaw.com

Attorneys for Defendant and Counterclaimant,
PRIVATE EYES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIRST ADVANTAGE BACKGROUND SERVICES CORP., a Florida corporation,<br><br>Plaintiff,<br><br>vs.<br><br>PRIVATE EYES, INC., a California corporation, DOES 1-10<br><br>Defendants.<br>_____<br>AND RELATED COUNTERCLAIM. | Case No.: C 07-02424 SC<br><br>**DECLARATION OF RICHARD T. WHITE IN SUPPORT OF COUNTERCLAIMANT'S AMENDED MOTION FOR LEAVE TO FILE A THIRD AMENDED COUNTERCLAIM TO ADD CAUSES OF ACTION FOR VIOLATION OF THE CALIFORNIA UNFAIR TRADE SECRETS ACT AND COMMON LAW UNFAIR COMPETITION**<br>**[F.R.C.P. 15]**<br><br>Judge: Honorable Samuel Conti<br>Dept.: Courtroom 1<br>Complaint Filed: May 4, 2007<br>Hearing: July 25, 2008 |

I, Richard T. White, declare:

1.     I am a member of the law firm of Fitzgerald Abbott & Beardsley LLP.  I am one

of the attorneys of record for Defendant/Counterclaimant PRIVATE EYES, INC. (hereinafter

"PEI") in the instant matter.  I am licensed to practice law in the United States District Court for

---

1

DECLARATION OF RICHARD T. WHITE IN SUPPORT OF COUNTERCLAIMANT'S AMENDED MOTION FOR LEAVE TO FILE A THIRD AMENDED COUNTERCLAIM TO ADD CAUSES OF ACTION FOR VIOLATION OF THE CALIFORNIA UNFAIR TRADE SECRETS ACT AND COMMON LAW UNFAIR COMPETITION, Case No.: C 07-02424 SC

1    the Northern District of California.  The following statements are based on my personal

2    knowledge and I could and would competently testify thereto in a court of law.

3         2.    The law firm of Fitzgerald Abbott & Beardsley LLP substituted as counsel for

4    Defendant PEI pursuant to Substitution of Attorney which was filed with this Court on June 6,

5    2008.  Since our firm's substitution, we received and reviewed approximately six extra large

6    bankers' boxes of PEI documents, plus former counsel's pleading and other files.  We paid

7    particular attention to prior orders of this Court issued on September 5, 2007, and March 5,

8    2008, as well as Plaintiff's Motion to Strike PEI's Second Amended Counterclaim and PEI's

9    Motion for Leave to File Proposed Third Amended Counterclaim, both of which were scheduled

10   for hearing on July 11, 2008.  We also evaluated and began preparing responses to outstanding

11   and overdue PEI responses to fifty document requests and to seventeen interrogatories

12   propounded by Plaintiff.

13        3.    As a result of this evaluation, we determined that a number of the points raised in

14   Plaintiff's Motion to Dismiss and Strike were well-taken to the extent they addressed the

15   September 5, 2007, and March 5, 2008, Orders of this Court.  We also determined that prior

16   counsel for PEI had not included preliminary allegations of PEI's status as a certificated Women

17   Owned Business to help clients achieve Supplier Diversity goals, or included either a claim

18   under the California Uniform Trade Secrets Act or a common law unfair competition claim

19   approved by the court in City Solutions, Inc. v. Clear Channel Communications, Inc. (2004) 365

20   F.3d 835 which appeared to apply to the facts of this case.  Accordingly, we approached

21   Plaintiff's counsel and requested a stipulation allowing us as new counsel for PEI to withdraw

22   the pending Motion for Leave and attached Proposed Third Amended Counterclaim, and instead

23   to file an Amended Motion and Amended Proposed Third Amended Counterclaim to address

24   these issues.  Plaintiff's counsel agreed.  By PEI's withdrawal of its pending Motion for Leave to

25   file a Proposed Third Amended Counterclaim and the parties' Stipulation filed with this Court

26

27

28

2

DECLARATION OF RICHARD T. WHITE IN SUPPORT OF COUNTERCLAIMANT'S AMENDED MOTION
FOR LEAVE TO FILE A THIRD AMENDED COUNTERCLAIM TO ADD CAUSES OF ACTION FOR
VIOLATION OF THE CALIFORNIA UNFAIR TRADE SECRETS ACT AND COMMON LAW UNFAIR
COMPETITION, Case No.: C 07-02424 SC

1  on June 20, 2008, Plaintiff's Motion to Dismiss and Strike and PEI's Amended Motion for Leave

2  to file a Third Amended Counterclaim will be heard on July 25, 2008.

3       4.       Attached to this declaration, as Exhibit A, is the [proposed] Third Amended

4  Counterclaim that PEI seeks leave of this Court to file.

5       5.       The [proposed] Third Amended Counterclaim represents PEI's good faith efforts

6  to remedy the deficiencies contained in the previous Counterclaims.  Specifically, PEI has

7  sought to remove all causes of action, and parts thereof that were filed, and proposed to be filed,

8  but were previously dismissed with prejudice by the Court.  PEI deleted the portion of the Sixth

9  Cause of Action for Fraud-False Promise I, that was based on FADV's promise not to solicit

10 business from Coca-Cola Enterprises (hereinafter "CCE"); the former Seventh Cause of Action

11 for Fraud-False Promise II in its entirety; the former Eighth Cause of Action for Intentional

12 Misrepresentation in its entirety; and the former Tenth Cause of Action for Fraud False Promise

13 III in its entirety.

14      6.       PEI has also added to the preliminary allegations to point out that PEI is a one-

15 hundred percent woman owned business certified by the Women's Business Enterprise national

16 Council that was a principal reason why CCE contracted with PEI in the first instance, and

17 carried that theme forward with respect to claims against First Advantage to the extent Plaintiff

18 sought to advantage itself due to PEI's special status.  PEI has also added facts to its Sixth Cause

19 of Action for Fraud-False Promise to address the Court's concern that the cause of action was

20 preempted by California Unfair Trade Secrets Act (CUTSA), California Civil Code section

21 3426 et seq.  Such facts demonstrate that in 2006, FADV disclosed PEI's invoicing and payment

22 procedures.  Such information falls within the scope of PEI's confidential and proprietary

23 information, but it would *not* constitute a trade secret within the definition of CUTSA.  PEI

24 asserts a separate cause of action for violation of CUTSA based on FADV's disclosure of PEI's

25 cost information and profits margins which would constitute trade secrets, and a common law

26 cause of action for unfair competition in accordance with the Court's previous Orders.  Finally,

27

28

3

DECLARATION OF RICHARD T. WHITE IN SUPPORT OF COUNTERCLAIMANT'S AMENDED MOTION
FOR LEAVE TO FILE A THIRD AMENDED COUNTERCLAIM TO ADD CAUSES OF ACTION FOR
VIOLATION OF THE CALIFORNIA UNFAIR TRADE SECRETS ACT AND COMMON LAW UNFAIR
COMPETITION, Case No.: C 07-02424 SC

1    PEI has sought to be more specific with respect to its damage claims in each of the proposed

2    causes of action.

3        7.    The proposed CUTSA cause of action alleges that FADV wrongfully disclosed

4    trade secrets, specifically cost information and profit margins, to CCE in violation of the

5    California Uniform Trade Secrets Act.

6        8.    The common law unfair competition claim asserts that in March 2006, James

7    Gizzard and Bart Valdez of FADV prepared and presented a Power Point presentation to CCE

8    decision makers that included invoicing and payment procedures used by PEI for all drug

9    testing, alcohol tests, and exams.  Notably, FADV disclosed that FADV would not charge as

10   much as PEI for its services.  FADV also disclosed that PEI's contract with FADV required net

11   payment from PEI on the twenty-second day of the month, while CCE was required to pay PEI

12   on the tenth day of the month.  Such information was the confidential and proprietary

13   information of PEI and was subject to the non-disclosure agreement entered into by PEI and

14   FADV.

15       9.    The trial in this case has been set for December 8, 2008.  At the time this

16   declaration is being filed, discovery has just commenced.  FADV has propounded Requests for

17   Production and Interrogatories upon PEI to which PEI will have responded in full by June 27,

18   2008.  PEI intends to propound discovery on FADV within the next week.

19       10.   The parties have not taken any depositions in this matter.  It is not expected that

20   these new claims will appreciably increase the amount of discovery, since the new claims are

21   related to other claims which have not been dismissed.

22       11.   Based on the foregoing, I respectfully request that this Court grant PEI leave to

23   amend to cure the deficiencies in prior pleadings, and assert new causes of action for violation

24   of the California Uniform Trade Secrets Act and common law unfair competition.

25

26

27

                                            4

28   DECLARATION OF RICHARD T. WHITE IN SUPPORT OF COUNTERCLAIMANT'S AMENDED MOTION
     FOR LEAVE TO FILE A THIRD AMENDED COUNTERCLAIM TO ADD CAUSES OF ACTION FOR
     VIOLATION OF THE CALIFORNIA UNFAIR TRADE SECRETS ACT AND COMMON LAW UNFAIR
                        COMPETITION, Case No.: C 07-02424 SC
     6/27/08 (25420) #305029.1

1    I declare under penalty of perjury of the laws of the State of California and of the United

2    States of America that the foregoing is true and correct.  Executed on the 2𝑇ᵗʰ day of June, 2008

3    in Oakland, California.

4    _____

5    Richard T. White

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

_____
5

DECLARATION OF RICHARD T. WHITE IN SUPPORT OF COUNTERCLAIMANT'S AMENDED MOTION
FOR LEAVE TO FILE A THIRD AMENDED COUNTERCLAIM TO ADD CAUSES OF ACTION FOR
VIOLATION OF THE CALIFORNIA UNFAIR TRADE SECRETS ACT AND COMMON LAW UNFAIR
COMPETITION, Case No.: C 07-02424 SC

# EXHIBIT A

RICHARD T. WHITE #58622
WILLIAM E. ADAMS #153330
SARA N. PASQUINELLI #233512
FITZGERALD ABBOTT & BEARDSLEY LLP
1221 Broadway, 21st Floor
Oakland, California  94612
Telephone: (510) 451-3300
Facsimile: (510) 451-1527
Email: rwhite@fablaw.com; wadams@fablaw.com;
spasquinelli@fablaw.com

Attorneys for Defendant and Counterclaimant,
PRIVATE EYES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIRST ADVANTAGE BACKGROUND SERVICES CORP., a Florida corporation,<br><br>Plaintiff,<br><br>vs.<br><br>PRIVATE EYES, INC., a California corporation, DOES 1-10<br><br>Defendants.<br>_____<br>AND RELATED COUNTERCLAIM. | Case No.: C 07-02424 SC<br><br>**[PROPOSED] THIRD AMENDED COUNTERCLAIM**<br><br>1.  BREACH OF WRITTEN CONTRACT<br>2.  BREACH OF ORAL CONTRACT<br>3.  UNJUST ENRICHMENT<br>4.  INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIP<br>5.  INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE<br>6.  FRAUD - FALSE PROMISE I<br>7.  ACCOUNT STATED [FIRST ADVANTAGE ONLY]<br>8.  OPEN BOOK ACCOUNT (COMMON COUNT) [FIRST ADVANTAGE ONLY]<br>9.  VIOLATION OF CALIFORNIA UNIFORM TRADE SECRETS ACT [CIVIL CODE §3246 et seq.]<br>10. COMMON LAW UNFAIR COMPETITION<br><br>Judge: Honorable Samuel Conti<br>Dept.: Courtroom 1<br>Complaint Filed: May 4, 2007 |

PRIVATE EYES, INC. hereby counterclaims against FIRST ADVANTAGE

BACKGROUND SERVICES CORP. and against ROES 1-20 and alleges as follows:

1.

[PROPOSED] THIRD AMENDED COUNTERCLAIM

6/27/08 (25420) #304385.1

## PARTIES

1.      PRIVATE EYES, INC. (hereinafter "PEI") is, and at all relevant times mentioned herein was, a corporation organized and existing under the laws of the State of California with its principal place of business in Walnut Creek, California.  PEI is a Women Owned Business, certified by Women's Business Enterprise National Council (hereinafter "WBENC").  PEI provides an array of background checks, and similar services, for employers seeking to hire and retain personnel.  Among other services, PEI offers drug testing, physicals, motor vehicle records checks (hereinafter "MVR"), and employee background verifications.  On occasion, PEI subcontracts such services to third-party vendors.

2.      PEI is informed and believes, and on that basis alleges, that FIRST ADVANTAGE BACKGROUND SERVICES CORP. (hereinafter "FADV ") is a Florida corporation with its principal place of business in St. Petersburg, Florida.  PEI is further informed and believes, and on that basis alleges, that FADV is the successor in interest to EMPLOYEE INFORMATION SERVICES, INC. (hereinafter "EIS").  As successor in interest, FADV is legally responsible for all obligations, arising from contract, tort, statute, or otherwise, incurred by EIS.

3.      PEI is ignorant of the true names and capacities of counter-defendants ROES 1 through 20, inclusive, and sues counter-defendants by fictitious names herein.  PEI prays leave to amend this Counterclaim to allege their true names and capacities when the same have been ascertained.

4.      At all times herein mentioned, FADV and ROES 1 through 20, inclusive, were the agents, servants, employees, or independent contractors of each of the remaining counter-defendants and at all times herein relevant were acting within the course and scope of said relationship.

## JURISDICTION AND VENUE

5.      The Court has original jurisdiction over this action under 28 U.S.C. § 1332, in that it is a civil action between citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

2.

[PROPOSED] THIRD AMENDED COUNTERCLAIM

6/27/08 (25420) #304385.1

6.    Venue for this counterclaim is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. §1391 since PEI has a substantial presence in the Northern District of California and FADV has elected to bring its Complaint in this venue.  Venue for a counterclaim is proper in the federal district court where the Complaint is brought.

7.    Venue for the counterclaim is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391 on one or more of the following grounds: (1) ROES 1-20 have a substantial presence in the district, (2) a substantial part of the events and omissions, which gave rise to this action, including the place where at least part of the contracts were to be performed and where the breaches occurred took place, were in this~ district, and (3) a substantial portion of the tortious actions took place within this district.

## GENERAL ALLEGATIONS

8.    In or about February 2002, PEI was selected by Coca Cola Enterprises, Inc. (hereinafter "CCE") to be the sole source provider (CCE's first sole source provider) for pre-employment screening services to include background investigations, drug testing, physicals, and driver qualification file maintenance.  PEI was also chosen by CCE to provide annual MVRs for Department of Transportation drivers and pre-employment MVRs.  CCE specifically requested that PEI obtain certification as a Women Owned Business to help them achieve their Supplier Diversity Goals.  On or about April 2002, PEI was certified by WBENC.  PEI is informed and believes and based thereupon asserts that CCE chose PEI as its sole source provider as a result of its status as a minority business.

9.    The aforementioned agreement between PEI and CCE was verbal and provided that CCE would assign the services to PEI on an as-needed basis, and PEI would perform such services at a stated price.  The verbal contract permitted, but did not require, that PEI could subcontract the performance of some or all of the services to third-party vendors.  There was one written agreement between CCE and Private Eyes.  This agreement was a user agreement for background checks and an addendum for the pricing for background checks.  This user agreement was signed by PEI and CCE on or about January 31, 2003.  This agreement covered

3.

[PROPOSED] THIRD AMENDED COUNTERCLAIM

6/27/08 (25420) #304385.1

1   the service for background investigations and MVRs.  The services to be subcontracted, namely

2   drug testing, physicals and driver qualification file maintenance, were part of the verbal

3   agreement with CCE.   A true and correct copy of the User Agreement between PEI and CCE,

4   dated January 31, 2003, is attached hereto as Exhibit 1.

5          10.    PEI had a reasonable expectation that it would periodically receive assignments

6   from CCE for the services mentioned above, so long as it performed the services in a

7   satisfactory manner.

8          11.    In or about March 2002, PEI subcontracted some of the services referenced

9   above to EIS, the predecessor in interest to FADV.  The services included maintenance of driver

10  qualification files, applicant/employee physicals, and drug testing.  A true and correct copy of

11  the written Letter of Understanding between PEI and EIS, which was drafted by EIS and signed

12  by PEI's authorized agent Sandra James on March 29, 2002, is attached hereto as Exhibit 2

13  (hereinafter "PEI/EIS LOU").

14         12.    As part of the PEI/EIS LOU, EIS represented and agreed that it would not

15  "directly solicit Coca-Cola for any of the services provided by Private Eyes unless it receives

16  the written consent of Private Eyes."

17         13.    PEI and EIS both agreed that only PEI had a contractual relationship with CCE

18  for the services that were subcontracted in the PEI/EIS LOU.  Accordingly, only PEI would

19  invoice CCE for the services.  In turn, PEI agreed to pay EIS within a reasonable amount of

20  time of receiving payment from CCE.  If CCE took any payment discounts, or otherwise

21  reduced its payments, EIS agreed that its own invoice would be discounted and reduced to the

22  same extent.

23         14.    In or about September 2003, FADV acquired EIS and became its legal successor

24  in interest for all rights and liabilities, including all rights and liabilities that EIS had under the

25  PEI/EIS LOU.  In an agreement dated October 8, 2003, drafted by FADV and signed by Sandra

26  James as officer for PEI, FADV reiterated its prior agreement not to use any confidential

27  information "obtained from Private Eyes to intentionally solicit, endeavor, to entice away from,

28  or otherwise interfere with the relationship Private Eyes has with any of its employment

4.

[PROPOSED] THIRD AMENDED COUNTERCLAIM

1   background screening customers, clients, suppliers, or other entity with whom they do business,

2   based on the Confidential Information." Furthermore, FADV agreed that it "may not use the

3   Confidential Information for sales and marketing efforts to its existing or prospective

4   employment background screening customers." A true and correct copy of the Agreement is

5   attached as Exhibit 3 (hereinafter "PEI/FADV Agreement").

6         15.    In or about January or February 2004, FADV solicited CCE to obtain the

7   contract for MVRs. These are the same services that CCE had been assigning to PEI pursuant

8   to their verbal contract. FADV used its position as PEI's subcontractor to take advantage of

9   PEI's connection with CCE (as a Women Owned Business). But for PEI's connection with

10   CCE, CCE would not have considered FADV to perform MVRs. This solicitation was a direct

11   violation of the terms set forth the PEI/EIS LOU and PEI/FADV Agreement, which prohibited

12   such solicitation.

13         16.    As a direct result of FADV's solicitation, and for no other reason, CCE ceased

14   assigning MVRs to PEI and began assigning them to FADV. As a result, PEI was deprived of

15   all profits it had been making on the MVR assignments.

16         17.    In or about April of 2004, PEI learned for the first time that FADV had solicited

17   the MVRs from CCE and was now doing such work directly for CCE. Again, FADV used its

18   position as PEI's subcontractor to take advantage of PEI's relationship with CCE (as a Women

19   Owned Business). PEI is informed and believes and based thereupon contends that CCE would

20   not have considered FADV to perform MVRs, if it had not been for PEI's relationship with

21   CCE.

22         18.    PEI attempted to negotiate a reasonable resolution of FADV's violation of the

23   non-solicitation agreements set forth in the PEI/EIS LOU and PEI/FADV Agreement. FADV

24   verbally agreed that it would pay PEI $1.80 for each MVR that it performed directly for CCE.

25   These were labeled "commissions," although they were, in fact, reimbursements for at least

26   some of the lost profits that PEI had sustained in the past and would continue to sustain in the

27   future. The $1.80 was a compromise, and not necessarily reflective of the entire amount of

28   PEI's lost profits. The lost profit calculation did not reimburse PEI for the loss in value the

[PROPOSED] THIRD AMENDED COUNTERCLAIM

6/27/08 (25420) #304385.1

1  company would sustain due to the reduction in the revenue from the loss of CCE's business.  A

2  true and correct copy of a letter from PEI's counsel, to Bart Valdez of FADV, confirming the

3  verbal agreement that the parties entered into, dated July 2, 2004, is attached hereto as Exhibit 4.

4          19.    Pursuant to the verbal agreement, FADV made payments to PEI for the MVRs it

5  was performing directly for CCE.  FADV paid $1.80 for some of the MVRs it performed

6  directly for CCE.  FADV made partial payments on the MVR's for some months, and then

7  ceased making payments entirely.  PEI later learned that FADV did not pay for all of these

8  MVRs.  The number of MVRs that FADV failed to pay for is unknown to PEI at this time.

9          20.    In or about spring 2005, PEI learned for the first time that FADV was soliciting

10  all remaining services from CCE.  These were other services, such as physicals and drug testing,

11  that CCE had been assigning to PEI and that PEI had in turn subcontracted to FADV.  Once

12  again, FADV used its arrangement as PEI's subcontractor, to take advantage of PEI's

13  relationship with CCE (as a Women Owned Business).  PEI is informed and believes and based

14  thereupon, asserts that CCE would not have considered FADV to perform these services, if it

15  had not been for PEI's relationship with CCE.

16          21.    The solicitation was in direct violation of the terms of the PEI/EIS LOU and

17  PEI/FADV Agreement.

18          22.    In or about the spring of 2005, PEI learned for the first time that FADV had

19  disclosed confidential and proprietary information to CCE.  This confidential and proprietary

20  information included the profits that PEI earned on the physicals that CCE assigned to it.  CCE

21  used this confidential and proprietary information to insist that PEI charge less for the services.

22  FADV only obtained access to PEI's profit margin on the physicals because it had subcontracted

23  to perform the work for PEI.  As such, FADV's disclosure was in violation of the terms of the

24  PEI/FADV Agreement.

25          23.    Again in or about March 2006, FADV representatives disclosed PEI's

26  confidential and proprietary information to CCE representatives to encourage CCE to switch to

27  FADV.  At this time, FADV disclosed PEI's pricing and profit margins to show CCE that it

28

[PROPOSED] THIRD AMENDED COUNTERCLAIM

6/27/08 (25420) #304385.1

1    would save roughly $400,000 on background checks by switching over to FADV.  In addition,

2    FADV also disclosed PEI's invoicing and payment procedures to CCE.

3        24.    On or about September 28, 2006, CCE informed PEI that it would be assigning

4    all of the services to different vendors.  PEI is informed and believes and thereupon alleges, that

5    CCE made this decision for the following two reasons: (1) it was not satisfied with the quality

6    and timeliness of the services that PEI had subcontracted to EIS/FADV, and (2) it was wary of

7    the friction between PEI and EIS/FADV, as a result of FADV's direct solicitation of CCE

8    services.

9                                    **FIRST COUNT**

10                          **(BREACH OF WRITTEN CONTRACT)**

11                                    **[All Defendants]**

12       25.    PEI realleges and incorporates by reference each and every allegation contained

13   in paragraphs 1-24, inclusive, as if fully set forth herein.

14       26.    On or about March 29, 2002, PEI and EIS entered into the PEI/EIS LOU.

15       27.    On or about September 2003, FADV became the successor in interest to EIS, and

16   therefore assumed responsibility for all of its legal obligations, including those set forth in the

17   PEI/EIS LOU.

18       28.    On or about October 2003, PEI and FADV entered into the PEI/FADV

19   Agreement.

20       29.    PEI complied with all conditions precedent under both the PEI/EIS LOU and

21   PEI/FADV Agreement, and performed all of its obligations that were not legally suspended,

22   excused, or extinguished.

23       30.    FADV breached the terms of both the PEI/EIS LOU and PEI/FADV Agreement

24   by directly soliciting MVR's from CCE.  PEI is also informed and believes, and based thereon

25   alleges, that ROES 1-20 materially contributed to the breach.

26       31.    FADV breached the terms of both the PEI/EIS LOU and PEI/FADV Agreement

27   by directly soliciting all remaining services from CCE.  PEI is also informed and believes, and

28   based thereon alleges, that ROES 1-20 materially contributed to the breach.

[PROPOSED] THIRD AMENDED COUNTERCLAIM

6/27/08 (25420) #304385.1

32.     FADV further breached the terms of the PEI/FADV Agreement by disclosing confidential and proprietary information to CCE, including but not limited to, the profit margins that PEI earned on the physicals that CCE assigned to it.  PEI is also informed and believes, and thereupon alleges, that ROES 1-20 materially contributed to the breach.

33.     FADV further breached the terms of both the PEI/EIS LOU and PEI/FADV Agreement by failing to perform the services it subcontracted to perform in a manner that was satisfactory to CCE.   Satisfactory performance was an explicit and implied term of both the PEI/EIS LOU and PEI/FADV Agreement.  PEI is also informed and believes and based thereupon alleges, that ROES 1-20 materially contributed to the breach.

34.     As a direct and proximate result of the aforementioned mentioned breaches of contract, PEI has sustained damages in an amount to be proven at trial.  The approximate amount of damages is $1 million dollars per year that the PEI and CCE relationship would have continued but for FADV's breach of the non-disclosure and non-solicitation agreements (for a period of not less than five years), plus prejudgment interest at the legal rate.  Further, based on the aforementioned breaches of contract, PEI has incurred attorneys' fees and costs in maintaining this action.  PEI will continue to incur such interest, fees and costs in amounts to be proven at trial.

WHEREFORE, PEI prays for relief as set forth below.

## SECOND COUNT

### (BREACH OF ORAL CONTRACT)

#### [All Defendants]

35.     PEI realleges and incorporates by reference each and every allegation contained in paragraphs 1-34, inclusive, as if fully set forth herein.

36.     In or about the summer of 2004, FADV verbally agreed to pay $1.80 to PEI for each MVR that FADV directly performed for CCE.  The agreement was reached to resolve a legal dispute between PEI and FADV, and therefore valid consideration supports the agreement.

37.     FADV breached the verbal agreement by not paying $1.80 for each and every MVR it performed for CCE.  PEI did not learn that FIRST ADVANTAGE had not paid for each

8.

[PROPOSED] THIRD AMENDED COUNTERCLAIM

1   and every MVR until the summer of 2005. The actual amount of MVRs that FA failed to pay

2   for in unknown to PEI. PEI is informed and believes and thereupon alleges, that ROES 1-20

3   materially contributed to the aforementioned breach.

4         38.    As a direct and proximate result of the aforementioned breach of verbal contract,

5   PEI has sustained damages in an amount to be proven at trial, in the approximate amount of

6   $155,000, plus prejudgment interest at the legal rate. Further, based on the aforementioned

7   breach of verbal contract, PEI has incurred attorneys' fees and costs in maintaining this action.

8   PEI will continue to incur such interest, fees and costs in amounts to be proven at trial.

9         WHEREFORE, PEI prays for relief as set forth below.

10  ### THIRD COUNT

11  ### (UNJUST ENRICHMENT)

12  ### [All Defendants]

13        39.    PEI realleges and incorporates by reference each and every allegation contained

14  in paragraphs 1-34, inclusive, as if fully set forth herein.

15        40.    FADV has performed services for CCE that CCE had originally assigned to PEI.

16        41.    FADV was only able to obtain such services by violating the terms of the

17  PEI/EIS LOU and PEI/FADV Agreement, including the non-solicitation and non-disclosure

18  agreement. Once again, FADV used its arrangement as PEI's subcontractor, to take advantage

19  of PEI's relationship with CCE (as a Women Owned Business). PEI is informed and believes

20  and based thereupon asserts that CCE would not have considered FADV to perform these

21  services, if it had not been for PEI's relationship with CCE.

22        42.    PEI is informed and believes and thereupon alleges, that ROES 1-20 materially

23  contributed to the violations.

24        43.    Due to FADV's violations of the PEI/EIS LOU and PEI/FADV Agreement,

25  FADV and ROES 1-20, and each of them, have been unjustly enriched in an amount equal to its

26  net profits in an amount to be proven at trial. The approximate amount of damages is $1 million

27  dollars per year that the PEI and CCE relationship would have continued but for FADV's breach

28

of the non-disclosure and non-solicitation agreements (for a period of not less than five years), plus prejudgment interest at the legal rate.

44.    FADV and ROES 1-20, and each of them, should therefore, be forced to disgorge the amount of their profits that are attributable to services for CCE.  The profits should be transferred to PEI by way of a constructive trust.

WHEREFORE, PEI prays for relief as set forth below.

## FOURTH COUNT

## (INTENTIONAL INTERFERENCE WITH EXISTING

## CONTRACTUAL RELATIONSHIP)

### [All Defendants]

45.    PEI realleges and incorporates by reference each and every allegation contained in paragraphs 1-24, inclusive, as if fully set forth herein.

46.    There was a valid verbal contract between PEI and CCE for services that would last so long as PEI satisfactorily performed services for CCE.

47.    FADV, and on information and belief ROES 1-20, knew of the contract.

48.    FADV, and on information and belief, ROES 1-20 intended to disrupt the performance of the aforementioned contract by directly soliciting business from CCE that CCE had been assigning to PEI and by disclosing PEI's confidential and proprietary information to CCE.  FADV used its status as PEI's subcontractor, to take advantage of PEI's relationship with CCE (as a Women Owned Business).  PEI is informed and believes and based thereupon, asserts that CCE would not have considered FADV to perform these services, if it had not been for PEI's relationship with CCE.

49.    The conduct of FADV and ROES 1-20 prevented performance by PEI or made performance more expensive or difficult by PEI.

50.    As a direct and proximate result of the aforementioned conduct by FADV and ROES 1-20, PEI has sustained damages in an amount to be proven at trial.  The approximate amount of damages is $1 million dollars per year that the PEI and CCE relationship would have continued but for FADV's intentional interference with the PEI and CCE relationship (for a

10.

1  period of not less than five years), plus prejudgment interest at the legal rate.  Further, based on

2  the aforementioned conduct, PEI has incurred attorneys' fees and costs in maintaining this

3  action.  PEI will continue to incur such interest, fees and costs in amounts to be proven at trial.

4        51.    FADV and ROES 1-20, in doing the foregoing, acted with malice, fraud, and/or

5  oppression and therefore punitive damages pursuant to Civil Code § 3294 are appropriate.

6        WHEREFORE, PEI prays for relief as set forth below.

7  **FIFTH COUNT**

8  **(INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC**

9  **RELATIONS)**

10  **[All Defendants]**

11        52.    PEI realleges and incorporates by reference each and every allegation contained

12  in paragraphs 1-24, inclusive, as if fully set forth herein.

13        53.    PEI and CCE were in an economic relationship that would have resulted in an

14  economic benefit to PEI.

15        54.    FADV, and on information and belief ROES 1-20, knew of the aforementioned

16  economic relationship between PEI and CCE.

17        55.    FADV, and on information and belief ROES 1-20, intended to disrupt the

18  aforementioned relationship.  FADV used its position as PEI's subcontractor, to take advantage

19  of PEI's relationship with CCE (as a Women Owned Business).  PEI is informed and believes

20  and based thereupon, asserts that CCE would not have considered FADV to perform these

21  services, if it had not been for PEI's relationship with CCE.

22        56.    FADV, and on information and belief ROES 1-20, engaged in wrongful conduct

23  through the following specific conduct:

24          a.    Engaging in common law trade libel, injurious falsehood, defamation,

25  and/or disparagement as follows:

26          1.    **Injurious Statement**: Steven Flack of FADV told Teresa Higdon

27  of CCE that Sandra James, in her capacity as President of Private Eyes, Inc.," "is a liar and

28  cannot be trusted."  Steve Flack falsely stated during the same conversation that Sandra James

11.

[PROPOSED] THIRD AMENDED COUNTERCLAIM

1  had offered to pass along to CCE "all discounts" that FADV provided to PEI for services.  When

2  Teresa Higdon told Steve Flack that PEI had not done so, Steven Flack made the statement that

3  Sandra James of PEI "is a liar and cannot be trusted."  The true facts are that Sandra James

4  never told anyone at FADV, including Steven Flack, that PEI would pass along "all discounts."

5  The statement was solely made in the context of the PEI-CCE and PEI-FADV business

6  relationships, including application of various discounts.  The statement about Sandra James, as

7  president of PEI, is therefore attributable to PEI.

8              2.      **Reason the Statement is Injurious**:  The statement that Sandra

9  James of PEI "is a liar and cannot be trusted" is injurious because it charges dishonesty to PEI.

10 Specifically, it charges that PEI provided its services to CCE in a dishonest manner since PEI

11 allegedly refused to pass along "all discounts" as it had allegedly promised to do.  This

12 statement is particularly damaging given the nature of PEI's business.  PEI is in the business of

13 providing high-quality, high-integrity background checks for Fortune 500 companies.  These

14 companies specifically rely on the quality and integrity of PEI, as a Women Owned Business,

15 and Sandra James, as the woman in charge of PEI.  These companies entrust their employees'

16 confidential information to PEI, and expect that PEI, as their background checker, operate

17 impeccably.  For Steven Flack to call Sandra James, in her capacity as President of PEI, "a liar"

18 directly calls into doubt PEI's integrity and ability to perform the specialized services CCE

19 sought from PEI.

20              3.      **Form of Statement**:  The statement from Steven Flack of FADV

21 to Teresa Higdon of CCE was made verbally, over the telephone.

22              4.      **Identity of Speaker**:  Steven Flack of FADV made the injurious

23 statement.

24              5.      **Identity of Recipient**:  Teresa Higdon of CCE was the recipient

25 of the injurious statement.

26              6.      **Time of Statement**:  June 13, 2005 at approximately 11:00 A.M.

27 EST.  Although this is when the statement was made, it did not cause any actual injury to PEI

28 until CCE terminated its business relationship with PEI in late 2006.  Accordingly, the tort was

_____
12.
[PROPOSED] THIRD AMENDED COUNTERCLAIM

1    not completed until that time. Furthermore, PEI did not learn of the injurious statement until on

2    or about June 27, 2005, when Teresa Higdon reported it to Sandra James on that day. PEI had

3    no reason to know of the statement prior to the time that Teresa Higdon disclosed it to Sandra

4    James.

5                 7.    **Location of Statement**: Steven Flack made the statement while

6    in St. Petersburg, Florida. Teresa Higdon was in Atlanta, Georgia. The verbal statement was

7    made over the telephone.

8                 8.    **Special Injury:** Prior to the libelous statement, PEI's business

9    with CCE in 2005, averaged approximately $405,000 per month, after the libelous statement,

10    PEI's business with CCE averaged roughly $395,000 per month. During 2006, PEI would have

11    averaged approximately $375,000 per month, but as a result of the libelous statement billed only

12    approximately $366,000 per month. Further, but for the libelous statement, the relationship

13    between PEI and CCE would have continued and would not have been terminated.

14        57.    PEI's relationship with CCE was in fact disrupted and thereafter terminated

15    because of the aforementioned conduct by FADV, and on information and belief by ROES 1-20.

16        58.    As a direct and proximate result of the aforementioned conduct by FADV and

17    ROES 1-20, PEI has sustained damages in an amount to be proven at trial, plus prejudgment

18    interest at the legal rate. Further, based on the aforementioned conduct, PEI has incurred

19    attorneys' fees and costs of bringing this action. PEI will continue to incur such interest, fees

20    and costs in amounts to be proven at trial.

21        59.    FADV, and on information and belief ROES 1-20, in doing the foregoing, acted

22    with malice, fraud, and/or oppression and therefore punitive damages pursuant to Civil Code

23    §3294 are appropriate.

24        WHEREFORE, PEI prays for relief as set forth below.

25

26

27

28

[PROPOSED] THIRD AMENDED COUNTERCLAIM

6/27/08 (25420) #304385.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SIXTH COUNT

### (FRAUD - FALSE PROMISE I)

### [All Defendants]

60.    PEI realleges and incorporates by reference each and every allegation contained in paragraphs 1-24, inclusive, as if fully set forth herein.

61.    FADV (directly and through its predecessor in interest EIS) made a promise to PEI that it would not disclose confidential and proprietary information.  The confidential and proprietary information was information, such as invoicing and payment procedures that PEI of necessity would have to disclose to FADV so that it could perform its subcontracted services. FADV made these promises in writing on or about March 19, 2002 and October 8, 2003, and verbally at other times throughout the period of the business relationship between FADV and PEI.  The writings included the PEI/EIS Contract, dated March 19, 2002, and the PEI/FADV Agreement, dated October 8, 2003, which are respectively attached hereto as Exhibit 2 and Exhibit 3.  The verbal representation was as follows:

a.    In approximately June 2005, Hayley Hitchcock represented during a conference call with Sandra James, Nenita Reyes, and Chris Joaquin of PEI that FADV would never again disclose confidential and proprietary information to CCE.  She made these representations because FADV had just disclosed confidential pricing information to CCE.  At the time she made these representations, FADV knew them to be false.

62.    The aforementioned promise made by FADV was material to the business transactions between FADV and PEI, since it was one of the primary reasons that PEI selected FADV to perform the services.  Had FADV not made such promise, PEI would not have subcontracted any of the work to FADV and FADV would not have had an inside position with CCE.  FADV's inside position greatly facilitated its ability to entice CCE away from PEI for certain business services.  FADV used its inside position to take advantage of PEI's relationship with CCE (as a Women Owned Business).

63.    FADV did not intend to perform the aforementioned promise.  Rather, FADV intended to disclose PEI's confidential and proprietary information, including invoicing and

14.

6/27/08 (25420) #304385.1

1   payment procedures, as soon as it could obtain some benefit or advantage from CCE by doing

2   so.

3       64.    FADV intended that PEI rely on the aforementioned promise so that PEI would

4   subcontract the services to it.

5       65.    PEI actually relied on the aforementioned promise by FADV by subcontracting

6   CCE business services, including MVR's, physicals, and drug testing, to FADV. Had FADV

7   not made the aforementioned promise, PEI would not have subcontracted the services to it.

8       66.    PEI reasonably relied on the aforementioned promise by FADV since non-

9   disclosure agreements are common in these types of transactions and FADV represented itself to

10  be an honest and ethical company. PEI did not first learn that FADV breached its promise not

11  to solicit business from CCE until after FADV convinced CCE to switch its business for the

12  MVR's. PEI first learned that FADV breached its promise not to disclose confidential and

13  proprietary information in 2005.

14      67.    FADV did not perform the aforementioned promise, because in March 2006,

15  James Grizzard and Bart Valdez of FADV, prepared and presented a Power Point presentation

16  to CCE decision makers, that included invoicing and payment procedures used by PEI for all

17  drug testing, alcohol tests, and exams. In particular, FADV disclosed that FADV would not

18  charge as much as PEI for its services. FADV also disclosed that PEI's contract with FADV

19  required net payment from PEI on the twenty-second day of the month, while CCE was required

20  to pay PEI on the tenth day of the month. Such information was the confidential and proprietary

21  information of PEI and was subject to the non-disclosure agreement entered into by PEI and

22  FADV. While CCE was aware of PEI's invoicing procedures (information that is readily known

23  in the background-check industry), it did not know PEI's invoicing procedures relative to

24  FADV's invoicing procedures until FADV presented its Power Point Presentation laying out

25  PEI's invoicing procedures compared with FADV's invoicing procedures. Moreover, while

26  CCE knew that it was paying PEI by the tenth day of each month and that there was some delay

27  in PEI's payment of FADV (information that is readily known in the background-check

28  industry), CCE did not know the exact sequencing of payment.

15.

[PROPOSED] THIRD AMENDED COUNTERCLAIM

1    68.    PEI was harmed by FADV's disclosure of proprietary and confidential

2    information to CCE, since CCE used such data to obtain unduly favorable concessions from PEI

3    that had the effect of reducing, or eliminating, PEI's profits.

4    69.    On information and belief, ROES 1-20 materially contributed to EIS/FADV's

5    failure to comply with the aforementioned promise.

6    70.    As a direct and proximate result of FADV's failure to perform the

7    aforementioned promise, PEI sustained monetary losses in an amount to be proven at trial. The

8    approximate amount of damages is $1 million dollars per year that the PEI and CCE relationship

9    would have continued but for FADV's promise not to disclose PEI's confidential and proprietary

10    information (for a period of not less than five years), plus prejudgment interest at the legal rate.

11    Further, based on the aforementioned conduct, PEI has incurred attorneys' fees and costs of

12    bringing this action.  PEI will continue to incur such interest, fees and costs in amounts to be

13    proven at trial.

14    71.    FADV, and on information and belief ROES 1-20, in doing the foregoing, acted

15    with malice, fraud, and/or oppression and therefore punitive damages pursuant to Civil Code

16    §3294 are appropriate.        .

17    WHEREFORE, PEI prays for relief as set forth below.

18    **SEVENTH COUNT**

19    **(ACCOUNT STATED)**

20    **[FADV ONLY]**

21    72.    PEI realleges and incorporates by reference each and every allegation contained

22    in paragraphs 1-24, inclusive, as if fully set forth herein.

23    73.    Within the last two years, in Contra Costa County, California, an account was

24    stated in writing by and between PEI and FADV wherein it was acknowledged that FADV was

25    indebted to PEI in the amount of approximately $255,000.  This indebtedness represented (1)

26    MVRs that FADV did for CCE, and (2) losses incurred by PEI due to FADV's disclosure of its

27    profits earned on physicals that CCE assigned to it.

28

16.

[PROPOSED] THIRD AMENDED COUNTERCLAIM

6/27/08 (25420) #304385.1

1    74.    Although demand has been made on FADV, no part of said sum has been paid,

2  and there is now due, owing and unpaid to PEI from FADV, the sum of at least $255,000, plus

3  interest on that amount at the legal rate from and after the date payment was due.

4    75.    PEI has incurred and will continue to incur attorneys' fees and costs in

5  connection with this matter in an amount to be determined at trial.  PEI is entitled to recover its

6  attorneys' fees and costs incurred pursuant to law, including under California Civil Code

7  section 1717.5.

8    WHEREFORE, PEI prays for relief as set forth below.

9    **EIGHTH COUNT**

10    **(OPEN BOOK ACCOUNT (COMMON COUNT))**

11    **[FADV ONLY]**

12    76.    PEI realleges and incorporates by reference each and every allegation contained

13  in paragraphs 1-24, inclusive, as if fully set forth herein.

14    77.    PEI and FADV had financial transactions between them arising from the CCE

15  business services.

16    78.    PEI kept an account of the debits and credits involved in the financial

17  transactions.

18    79.    FADV owes money on the account in the amount of approximately $255,000,

19  plus interest on that amount at the legal rate from and after the date payment was due.

20    80.    PEI has incurred and will continue to incur attorneys' fees and costs in

21  connection with this matter in an amount to be determined at trial. PEI is entitled to recover its

22  attorneys' fees and costs incurred pursuant to law, including under California Civil Code

23  section 1717.5.

24    WHEREFORE, PEI prays for relief as set forth below.

25

26

27

28

[PROPOSED] THIRD AMENDED COUNTERCLAIM

6/27/08 (25420) #304385.1

**NINTH COUNT**

**(VIOLATION OF CALIFORNIA UNIFORM TRADE SECRETS ACT, CALIFORNIA**

**CIVIL CODE SECTION 3426 et seq.)**

**[ALL DEFENDANTS]**

81.     PEI realleges and incorporates by reference each and every allegation contained in paragraphs 1-24, inclusive, as if fully set forth herein.

82.     In the course of its business, PEI maintains a number of trade secrets that are protected under California law.  Among such trade secrets that PEI maintains are the costs of providing services and the profit margins it earns on its services to its customers.  The cost of services and profit margins have independent economic value, actual or potential, to customers because if a customer learns of such information it can insist upon a reduced rate for the services because it knows the precise cost incurred to supply the service.  Further, if a customer believes the profit margin is excessive, it has the market power to take its business elsewhere without a concession.

83.     PEI took reasonable steps to maintain the secrecy of such cost information and profit margins by (1) only disclosing such information to persons with a "need to know" it for its business purposes and (2) requiring that any third parties who receive such information sign non-disclosure agreements.  The cost information and profit margins are information that is not generally known in the industry, as it represents internal accounting data.

84.     As part of its business relationship, PEI's cost information and profit margins on the CCE services was disclosed to FADV.  FADV had agreed to maintain the secrecy of such information in the non-disclosure agreements by way of the PEI/EIS Contract and PEI/FADV Agreement.

85.     Sometime in 2005, FADV wrongfully disclosed PEI's cost information and profit margins on the CCE account to representatives of CCE.  Such disclosure was in knowing violation of the written non-disclosure agreements included in the PEI/EIS Contract and PEI/FADV Agreement.  Such disclosure was also a violation of the California Uniform Trade

1    Secrets Act, specifically Civil Code §3426.l(b)(2)(B)(ii).   At no time did anyone at PEI consent,

2    expressly or implicitly, to FADV's disclosure of the cost information and profit margins to CCE.

3        86.    FADV's misappropriation of PEI's trade secrets (cost information and profit

4    margins) damaged PEI, because CCE used the information to insist that PEI reduce its profit

5    margins on the drug testing services.  The reduction in the profits was $5 per drug test.

6        87.    As a direct and proximate result of the aforementioned improper disclosure of

7    trade secrets, PEI was damaged in an amount to be proven at trial.  The approximate amount of

8    damages is $1 million dollars per year that the PEI and CCE relationship would have continued

9    but for FADV's disclosure of PEI's trade secrets.

10       88.    In addition, PEI seeks to recoup of all benefits that FADV gained through its

11   direct dealings with CCE, since such benefits were at least partially obtained because it

12   disclosed trade secret information to CCE.  FADV was therefore unjustly enriched, and PEI is

13   entitled to recover for that unjust enrichment pursuant to Civil Code §3426.3(a).

14       89.    FADV's conduct in misappropriating the aforementioned trade secrets was

15   willful and malicious, and therefore, exemplary damages in the amount of two times the award

16   for actual damages and unjust enrichment should be imposed, pursuant to Civil Code

17   §3426.3(c).  Furthermore, PEI is entitled to recovery of its reasonable attorneys' fees pursuant to

18   Civil Code §3426.4.

19       90.    ROES 1-20 materially contributed to the disclosure of the cost information and

20   profit margins and, are therefore, liable for the violation of the California Uniform Trade Secrets

21   Act.

## TENTH COUNT

### (COMMON LAW UNFAIR COMPETITION)

### [ALL DEFENDANTS]

25       91.    PEI realleges and incorporates by reference each and every allegation contained

26   in paragraphs 1-24, inclusive, as if fully set forth herein.

27       92.    In March 2006, James Grizzard and Bart Valdez of FADV, prepared and

28   presented a Power Point presentation to CCE decision makers that included invoicing and

19.

[PROPOSED] THIRD AMENDED COUNTERCLAIM

1    payment procedures used by PEI for all drug testing, alcohol tests, and exams.  Notably, FADV

2    disclosed that FADV would not charge as much as PEI for its services.  FADV also disclosed

3    that PEI's contract with FADV required net payment from PEI on the twenty-second day of the

4    month, while CCE was required to pay PEI on the tenth day of the month.  While CCE was

5    aware of PEI's invoicing procedures (information that is readily known in the background-check

6    industry), it did not know PEI's invoicing procedures relative to FADV's invoicing procedures

7    until FADV presented its Power Point Presentation laying out PEI's invoicing procedures

8    compared with FADV's invoicing procedures.  Moreover, while CCE knew that it was paying

9    PEI by the tenth day of each month and that there was some delay in PEI's payment of FADV

10   (information that is readily known in the background-check industry), CCE did not know the

11   exact sequencing of payment.

12        93.    PEI has invested substantial time, skill and money in developing its property,

13   which includes its invoicing and payment procedures.

14        94.    FADV appropriated and used PEI's invoicing and payment procedures at little or

15   no cost to FADV.

16        95.    FADV's use of PEI's invoicing and payment procedures was without the

17   authorization or consent of PEI.

18        96.    PEI has been injured by FADV's conduct because FADV's disclosure of PEI's

19   invoicing and payment procedures to CCE representatives caused CCE to seek unduly favorable

20   concessions from PEI, which in turn had the effect of reducing, or eliminating PEI's profits.

21        97.    As a direct and proximate result of the foregoing, PEI has sustained damages in

22   the amount of past and future lost profits that will be determined by expert testimony, but which

23   is expected to amount to approximately $1 million dollars per year that the PEI and CCE

24   relationship would have continued but for FADV's acts of unfair competition (for a period of not

25   less than five years), plus prejudgment interest at the legal rate.

26        WHEREFORE, PEI prays for relief as set forth below.

27                                  **PRAYER**

28        WHEREFORE, PEI prays for judgment against FADV and ROES 1-20 as follows:

20.

[PROPOSED] THIRD AMENDED COUNTERCLAIM

6/27/08 (25420) #304385.1

1      1.     For compensatory damages in the sum of no less than $5 million;

2      2.     For punitive damages pursuant to Civil Code §3294;

3      3.     For disgorgement of profits from FADV;

4      4.     For restitution from FADV;

5      5.     For all amounts that FADV was unjustly enriched because of its improper

6  disclosure of trade secrets;

7      6.     For two times the amount of actual damages and unjust enrichment, as exemplary

8  damages for the improper disclosure of trade secrets, pursuant to Civil Code §3426.3(c);

9      7.     For interest thereon as authorized by law;

10     8.     For reasonable attorneys' fees according to proof as authorized by Civil Code

11  §3426.4 and other law;

12     9.     For costs of suit incurred herein; and

13     10.    For such other and further relief as the Court deems just and proper.

14                            **DEMAND FOR JURY TRIAL**

15      Pursuant to Federal Rule of Civil Procedure 38 and any other applicable law or rules,

16  PEI hereby demands trial by jury of all issues so triable.

17

18  Dated:  June 27, 2008             FITZGERALD ABBOTT & BEARDSLEY LLP

19

20                           By  _____
                                   Richard T. White

21                                   Attorneys for Defendant and Counterclaimant,
                                   PRIVATE EYES, INC.

22

23

24

25

26

27

28

[PROPOSED] THIRD AMENDED COUNTERCLAIM

6/27/08 (25420) #304385.1

# EXHIBIT 1



**PRIVATE EYES**
*Employment Investigators*

# User Agreement
# Consumer Reports

Please read and complete this form and fax to Private Eyes. Incomplete or invalid
entries will delay the approval process and may cause rejection of service.

---

### YOU HAVE BEEN ASSIGNED CLIENT NUMBER:

### BUSINESS INFORMATION    (Address must be the physical location of the company)

Business Name of User: ____Coca-Cola Enterprises Inc.

Business Type: X Corporation   ☐ Partnership   ☐ LLP   ☐ LLC   ☐ Sole Proprietor   ☐ Government

Address: __2500 Windy Ridge Pkwy, Suite 700, Atlanta, GA 30080

| Street | City | State | Zip |

Primary Contact Name: _____Kaye Masters
    Corporate Procurement Mgr. G&A and Travel

| First | Last | Title |

Phone #: (_770_)_989-3155_____   Fax #: (770_) 989-3062_____   E-mail:_kamasters@na.cokecce.com_____

Billing Contact Name: __Aundrey Jenkins_____ _____   Phone #: (_813_)__569-2800_____

Please describe your company's business: _____Marketer, producer and distributor of nonalcoholic beverages

1. Please state the specific purpose for which you intend to use the information provided by Background Profiles:
   X Employment Purposes   ☐ Other (specify)_____

2. How long has your company been in business?: __16 yrs_____   List approx. number of employees: ___65,000_____

3. Type of building you are in: X Commercial   ☐ Industrial   ☐ Residential   ☐ Other (explain)_____

4. Please identify two principals (owners) of your business if privately owned, or provide the stock symbol and exchange if your business is publicly traded:

| NAME: | TITLE | PHONE |
|---|---|---|
|  |  |  |
|  |  |  |

OR, Symbol ____CCE_____          Exchange _____

---

### ACCOUNT SET-UP SPECIFICATIONS

Account Type: X Invoice Account

If you intend to use credit reports, please provide us with a copy of ONE of the following items (please check appropriate box):
   ☐ Business License   ☐ Sales Tax License   X Articles of Incorporation

Billing Information: ☐ Your Federal Tax I.D. Number 580503352_____   OR SS#_____ (if applicable)

☐ Net 30 day billing (Invoiced Account)    3%N15

X _____         _____    _____
   **User's Authorized Signature**              **Title**                 **Date**

   _____         _____    _____
**Private Eyes, Inc. Authorized Signature**        **Title**                 **Date**

# Terms and Conditions – Consumer Report User Agreement

This agreement by and between Private Eyes, Inc. (PEI) and the company named on the "User Agreement Consumer Reports" form and/or its designated agent(s) consists of the following understandings and conditions.

1. Use the services of and the reports received from Private Eyes in compliance with all provisions of the Fair Credit Reporting Act, 15 USC 1681 et seq. (FCRA), the Americans with Disabilities Act (ADA 1990) and all other applicable federal and state laws and regulations, including federal and state equal opportunity laws and regulations.

2. Comply with all legal obligations as outlined in the FCRA. A link to the FCRA can be found at www.privateeyesinc.com/fcra.

3. Use the information provided by PEI for the User's exclusive use only, except to disclose said information to the subject of the report, and for employment purposes, and only in accordance with applicable law.

4. User is the "End User" of the information provided by PEI and will not further sell said information to any third party.

5. Maintain copies of all written authorizations for a minimum of three (3) years from the date of inquiry.

6. Make a clear and conspicuous disclosure to the applicant or employee, in writing and in a separate document, that a consumer report may be obtained for employment purposes.

7. Make a clear and accurate disclosure to the applicant or employee if an investigative consumer report will be obtained, including a statement informing the applicant or employee of the report of his or her right to request additional information concerning the nature and scope of the investigation.

8. Obtain the proper written authorization from the applicant or employee for any consumer report or investigative consumer report prior to requesting a report.

9. Provide proper notice to the applicant or employee, a copy of the report obtained, and a Summary of Rights under the FCRA, as required by the FCRA, if an adverse decision regarding employment is going to be made due to information contained in a consumer report or investigative consumer report obtained from PEI.

10. Ensure that reports will be requested only by User's designated representatives and recognize that employees should not obtain reports on themselves, associates or any other person except in the exercise of their official duties.

11. Pursuant to the California Investigative Consumer Reporting Agencies Act, when consumer report or investigative consumer report is obtained on California applicant or employee for employment purposes, other than suspicion of wrongdoing by the applicant or employee, notify (not later than three (3) days after the date on which the report is first requested) the applicant or employee in writing that an investigative consumer report regarding the applicant's or employee's character, general reputation, personal characteristics, and mode of living will be made. This notification will include PEI's name and address and the nature and scope of the investigation requested. This notification will also include a summary of the provisions set forth in Section 1786.22 of the California Investigate Consumer Reporting Agencies Act.

12. Comply with Section 1786.16(b) of the California Investigative Consumer Reporting Agencies Act which states as follows: "Any person described in subdivision (d) of Section 1786.12 who requests an investigative consumer report regarding that consumer shall provide the consumer with a copy of the report and information on who issued the report and how to contact them, either at the time of the meeting or the interview with the consumer and the person who requests an investigative consumer report regarding that consumer or within seven days of the date such person receives the report, whichever is earlier."

13. Not hold PEI liable for any inaccuracy in information provided by PEI for any reason other than bad faith or negligence.

14. Recognize that once PEI has delivered User's client number to the main contact person listed on this agreement, that the security and dissemination of this unique client number is the responsibility of the person signing this agreement. PEI will neither release information nor take orders for service unless the client number is provided.

name, order date, charges, etc. Terms are NET 30 days. If payment is made prior to the 15th of the month, User will receive a 3% discount on monthly balance.

16. Acknowledge that a facsimile of this agreement is as valid as an original.

17. User, or any of its designated representatives, may terminate use of PEI's services at any time and for any reason.

## PRIVATE EYES INC. AGREES TO:

1. Comply with all applicable laws in the preparation and transmission of credit, consumer reports and investigative consumer reports as defined in the FCRA, California Consumer Credit and Investigative Consumer Reporting Agencies Acts (California Civil Code Division 3, Part 4, Title 1.6 and 1.6 A, Sections 1785 et seq. and 1786 et seq.), or other applicable federal and state laws and regulations, including federal and state equal employment opportunity laws and regulations.

2. Assist User in complying with Section 1786.16(b) of the California Investigative Consumer Reporting Agencies Act, by mailing to each California applicant or employee which User requests a consumer report or investigative consumer report a copy of his or her report within two (2) days of PEI providing said report to User.

3. Follow reasonable quality assurance procedures to assure maximum possible accuracy of information.

4. Re-verify at no cost any disputed report when either the User or the subject of a report makes a request in accordance with applicable law. PEI's response shall be made in writing and delivered within the time limitations set forth in the FCRA, California Consumer Credit and Investigative Consumer Reporting Agencies Acts or other applicable federal and state laws and regulations.

5. Maintain consumer report and investigative consumer report information and transaction details for a minimum of three (3) years. During an inquiry, the subject of the report has the right to learn the name of the User ordering information and has the right to receive a copy of the report ordered by the User when a lawful request is made to PEI.

6. Provide all information to the consumer as required by the FCRA, California Consumer Credit and Investigative Consumer Reporting Agencies Act or other applicable federal or state laws and regulations.

7. Maintain confidentiality of its data acquisition and verification methodology.

8. Have access to consumer reports from one or more consumer credit reporting agencies.

9. PEI may, at its sole discretion, terminate service to User. However, it must provide thirty (30) days written notice to User prior to termination of its services to User.

This agreement together with an exhibits and schedules attached hereto represents the entire agreement between User and PEI and supercedes all prior and contemporaneous agreements, express or implied, oral or written, related to the subject matter contained herein and may not be modified except in writing signed by both parties. Any modifications to this agreement that are required for PEI or User to remain in compliance with laws and regulations governing consumer reporting agencies must adhere to the aforementioned conditions.

# User Agreement
## Consumer Reports-Exhibit 1

## Pricing Terms and Conditions for Coca-Cola Enterprises Inc.



**Pricing Terms:**

**Standard Package: Required for all new hires - $69.00. If AKA identities or additional counties are found on the social security verification - $79.00.**

- **Social Security Trace** – Validation of accurate number and state issued.
- **Employment History** – Current and previous employment over last 7 years.
- **Education Verification** – Confirms highest level of education completed.
- **County Criminal Search** – All counties of work and residency over last 7 years.

**Additional Services:**

- **Motor Vehicle Report (MVR)** - $5.00 plus any state fees.
- **Credit Report** - $10.00
- **Accreditations (Associations/Licensing)** - $8.00 each
- **References** - $15.00 for three (3) references ($6.00 for each additional reference.)

**Conditions:**

- Additional charges may apply for out of the country calls, 900 numbers and court fees where applicable.
- A 3% discount will be given if invoice total is paid by the 15th of the month.

# CCE – Drug Screening Prices

$25 – In Network

$43 – Out of Network

$47 – Breath Alcohol

When collection performed by CCE employee - Varies

Mobiles – Varies

Substance Abuse Professionals (SAP) – Varies

Post Accident - Varies

Instant Drug Screening
*5 Panel Including Lab Analysis & MRO if needed - $15
*7 Panel Including Lab Analysis & MRO if needed - $18

QED - $6

Physicals - $55 to $80



190 North Wiget Lane, Suite220
Walnut Creek, CA 94598

**EXHIBIT 2**



Employee
Information
Services

[via email]

March 19, 2002

Ms. Sandra James
Private Eyes, Inc.
700 Ygnacio Valley Road #350
Walnut Creek, CA 94596

Dear Ms. James:

Thank you for taking time today to discuss the opportunities with Coca-Cola. I am biased, but I believe that Employee Information Services (EI) is uniquely able to partner with Private Eyes for this relationship and hopefully many others. Due to the relative speed in which this opportunity is developing, I believe it is worth documenting some of what has been discussed and agreed to at this point. Therefore, please consider this letter as a Letter of Understanding (LOU) and a work in process. For the purposes of this letter and in respect to time, this LOU applies for Coca-Cola but can be expanded at any time to address other prospects or current clients of Private Eyes and EI.

**Business Relationship:**

It is EI's understanding that Coca-Cola has contracted with Private Eyes for background screens and drug screening. Private Eyes is seeking a partner to provide drug screening services directly to Coca-Cola. Therefore, EI will provide complete support and services for drug screening directly to Coca-Cola.

As a result of this relationship and for the purposes of developing a partnership relationship with Private Eyes, Coca-Cola and possibly other clients, EI will agree not to directly solicit Coca-Cola for any of the services provided by Private Eyes unless EI receives the written consent of Private Eyes. In return, Private Eyes will agree not to directly solicit Coca-Cola for any of the services that are provided by EI unless Private Eyes receives the written consent of EI.

The parties realize that the success of the Coca-Cola relationship is dependant on the satisfactory performance of both of the service components of the contract. Private Eyes reserves the right to cancel subcontract with EIS if Coca-Cola expresses dissatisfaction with the performance of EIS and EIS is unable to correct any performance deficiencies within 30 days of formal or informal notice from Coca-Cola of such dissatisfaction.

## Invoicing

Since Coca-Cola's contract for services is with Private Eyes, Private Eyes will be responsible for unified invoicing to the client. Therefore, EI will agree to and provide data to Private Eyes to import into their financial package to generate appropriate invoicing. Specifications and methods of interfacing billing data will be agreed to at a later time.

## Pricing

EI offers Private Eyes the following pricing for services to be provided to Coca-Cola.

"In Network" Drug Screening                                    $23.00 per test
- Source in-network collection facilities
- Set up in-network collection facilities
- Complete urine specimen collection
- Set up laboratory accounts
- Order laboratory supplies
- Complete laboratory analysis
- Order pre-printed Custody and Control Forms
- Oversee Medical Review Officer services
- Report results
- Store records
- Consolidate urine collection, laboratory, MRO and program management fees

"Out of Network" Drug Screening                               $41.00 per test
- Source out of network collection facilities
- Set up out of network collection facilities
- Complete urine specimen collection
- Set up laboratory accounts
- Order laboratory supplies
- Complete laboratory analysis
- Order pre-printed Custody and Control Forms
- Oversee Medical Review Officer services
- Report results
- Store records
- Consolidate urine collection, laboratory, MRO and program management fees

Mobile/After-Hours Services:                                  see below
- Coordination for the collection of mobile/post-accident tests performed at $100/hour (one-hour minimum) plus the actual cost of the collection
- Mobile charges (which are based on mileage, wait time, number of people tested, tests performed and other applicable charges) passed through at cost

Please note that EI has additional services that can be quoted at a future time including:

DOT or Non-DOT physicals scheduling, review, and compliance
Medical Consultation and return to duty evaluation
Employee Assistance Programs (EAP)

Follow up testing / rehabilitation management
Policy development
Records Management (Driver files, compliance checks, etc)

**Payments and Rebates**

EI's billing data to Private Eyes will be at the rates listed above. Alternately, EI's bill to Private Eyes can be at a reduced rate and Private Eyes can "mark up" the amount for invoicing to the client.

It is EI's understanding that CocaCola will be offered a 3% discount (based on $23.00 actual cost of goods) for any invoices paid to Private Eyes less than net-15. Accordingly, EI will offer Private Eyes a 3% discount for any invoice paid to EI net-22 or less.

**Future Agreements**

It is understood and agreed to by both EI and Private Eyes that there may be additional agreements and / or contracts to formalize this or other business initiatives. Therefore, this LOU may be superceded.

Sandra, in the brief conversations that we have had to date, it is obvious that both of our companies have similar goals and priorities on service, value add, and mutually beneficial relationships. EI strives to infuse integrity and ingenuity into an industry that is plagued with border-line business practices. I am confident that as we continue to develop our abilities to partner together, our companies and our clients will benefit from our efforts.

Please do not hesitate to contact me. I look forward to working with you and your organization. To formalize our understandings and intents, if you find this LOU agreeable, please sign and return a copy to me.

Best Regards,

Todd Oliver

Todd Oliver
Employee Information Services

Agreed to by:

Sandra James
Private Eyes Incorporated

Date 3/29/02

.

**EXHIBIT 3**



# First Advantage
C O R P O R A T I O N

October 8, 2003

Sandra James
President
Private Eyes, Inc.
190 N. Wiget Lane #220
Walnut Creek, CA 94598

Dear Ms. James:

In connection with the pending transaction between First Advantage Corporation and Employee Information Systems, Inc. (EIS), First Advantage and Private Eyes desire to enter into this letter agreement ("Agreement") setting forth the parties understanding regarding Private Eyes customer information learned as a result of (i) Private Eyes' use EIS's drug screening services or (ii) future use of First Advantage's drug screening services, which may include EIS. For the purposes of this Agreement information Private Eyes discloses to First Advantage, including its client names, contacts and pricing, shall be deemed "Confidential Information."

Confidential Information disclosed by Private Eyes to First Advantage may only be used for the purpose of First Advantage providing drug screening services to Private Eyes' customers. First Advantage shall hold the Confidential Information in confidence and agrees to use the same degree of care it uses to protect its own confidential information, but in no event less than a reasonable standard of care.

First Advantage may not disclose Confidential Information to: (i) any of its employees or business representatives unless they have a need to know such information to carry out the pending transaction between First Advantage and EIS, (ii) any of its employees or agents for the purpose of providing employment background screening services, which shall exclude drug screening for the purpose of this Agreement, (iii) any third parties that are not providing consultation with regard to the pending transaction, (iv) any third parties unless they need the Confidential Information for the purpose of providing drug screenings services to Private Eyes.

First Advantage represents that it will not use Confidential Information obtained from Private Eyes to, intentionally solicit, endeavor to entice away from, or otherwise interfere with the relationship Private Eyes has with any of its employment background screening customers, clients, suppliers or other entity with whom they do business, based on the Confidential Information. First Advantage may not use the Confidential Information for sales and marketing efforts to its existing or prospective employment background screening customers.

In exchange for First Advantage's agreement not to use Confidential Information as stated, Private Eyes agrees to use First Advantage's drug screening services as its exclusive drug screening provider during the term of this Agreement.  Additionally, in exchange for Private Eyes agreeing to use First Advantage as its sole drug screening provider, First Advantage agrees that it will not intentionally solicit, endeavor to entice away from, or otherwise interfere with the relationship Private Eyes has with Coca Cola, Inc.

In some cases, First Advantage or one of its subsidiary companies may have the need to disclose its confidential information to Private Eyes ("FADV Confidential Information"). FADV Confidential Information may include but is not limited to client lists, marketing or sales plans, methodologies, business plans, financial information, trade secrets, know-how and such other information as may be marked from time-to-time. Private Eyes shall hold FADV Confidential Information in confidence and shall not disclose it to any third parties without the express written consent of First Advantage. Private Eyes agrees to use the

same degree of care it uses to protect its own confidential information, but in no event less than a reasonable standard of care.

The term "Confidential Information" or "FADV Confidential Information" does not include any information which the receiving party can demonstrate: (i) is at the time of disclosure is in the public domain or which after such disclosure comes into the public domain through no fault First Advantage or its representatives; (ii) was available to First Advantage on a non-confidential basis from a source other than Private Eyes or EIS, or their respective officers, directors, employees, or advisors, provided that such source is not and was not bound by a confidentiality agreement with Private Eyes; (iii) has been released without restriction Private Eyes to another person not covered by an agreement similar in terms to this agreement; (iv) is required to be disclosed by applicable law or regulation, but only to the extent and for the purposes of such required disclosure; or (v) is required to be disclosed by a valid order of a court or government agency with appropriate jurisdiction over the parties and the subject matter of the information, but only to the extent of and for the purposes of such order and only after the other party is afforded a reasonable opportunity to oppose such order or seek protection for further disclosure of the information.

Each party's Confidential Information (which for the purpose of this paragraph shall include FADV Confidential Information) is and will remain its sole property. Neither party obtains any ownership or license interest in any of the other's Confidential Information by virtue of its disclosure under this Agreement. Each party will return to or destroy the other all of the other's Confidential Information in its possession or control upon the expiration or termination of this Agreement. The disclosure of Confidential Information hereunder shall not be construed as granting any license to or right or ownership in the Confidential Information.

The parties acknowledge that the harm caused by the wrongful disclosure of Confidential Information and/or FADV Confidential Information will be difficult, if not impossible, to assess on a monetary basis alone, and that legal damages may not be sufficient compensation for such wrongful disclosure. Therefore, either party may enforce this Agreement by equitable means, including, but not limited to, injunctive relief, in addition to any other remedies to which it is otherwise entitled.

The term of this Agreement shall be for three (3) years from the date written above.

Neither party will assign their respective rights or duties under this Agreement to another without the prior express written consent of the other party, which consent shall not be unreasonably withheld or delayed. Any other purported assignment will be void.

This Agreement will be governed by and construed in accordance with the laws of the State of California. The parties agree to resolve any disputes arising from the terms of this agreement by arbitration, with such arbitration to be held in Contra Costa County, California.

All billing for drug screening services will continue to be made directly through Private Eyes and processed solely by them.

This Agreement represents the entire understanding between the parties with respect to the subject matter herein. The terms of this Agreement shall be binding upon and inure to the benefit of the parties and to their legal representatives and successors. No waiver, alteration or modification of any of the provisions of this Agreement shall be binding unless in writing and signed by a duly authorized representative of the parties.

If these terms meet with your understanding than please acknowledge your acceptance by countersigning below.

Sincerely,

Richard Heitzmann
Vice President, Corporate Development Officer

Agreed to and Accepted by:

Sandra James

**ei** **Employee**
**Information**
**Services**

[via email]

March 19, 2002

Ms. Sandra James
Private Eyes, Inc.
700 Ygnacio Valley Road #350
Walnut Creek, CA  94596

Dear Ms. James:

Thank you for taking time today to discuss the opportunities with Coca-Cola.  I am biased, but I believe that Employee Information Services (EI) is uniquely able to partner with Private Eyes for this relationship and hopefully many others.  Due to the relative speed in which this opportunity is developing, I believe it is worth documenting some of what has been discussed and agreed to at this point.  Therefore, please consider this letter as a Letter of Understanding (LOU) and a work in process.  For the purposes of this letter and in respect to time, this LOU applies for Coca-Cola but can be expanded at any time to address other prospects or current clients of Private Eyes and EI.

**Business Relationship:**

It is EI's understanding that Coca-Cola has contracted with Private Eyes for background screens and drug screening.  Private Eyes is seeking a partner to provide drug screening services directly to Coca-Cola.  Therefore, EI will provide complete support and services for drug screening directly to Coca-Cola.

As a result of this relationship and for the purposes of developing a partnership relationship with Private Eyes, Coca-Cola and possibly other clients, EI will agree not to directly solicit Coca-Cola for any of the services provided by Private Eyes unless EI receives the written consent of Private Eyes.  In return, Private Eyes will agree not to directly solicit Coca-Cola for any of the services that are provided by EI unless Private Eyes receives the written consent of EI.

The parties realize that the success of the Coca-Cola relationship is dependant on the satisfactory performance of both of the service components of the contract.  Private Eyes reserves the right to cancel subcontract with EIS if Coca-Cola expresses dissatisfaction with the performance of EIS and EIS is unable to correct any performance deficiencies within 30 days of formal or informal notice from Coca-Cola of such dissatisfaction.

**Invoicing**

Since Coca-Cola's contract for services is with Private Eyes, Private Eyes will be responsible for unified invoicing to the client. Therefore, EI will agree to and provide data to Private Eyes to import into their financial package to generate appropriate invoicing. Specifications and methods of interfacing billing data will be agreed to at a later time.

**Pricing**

EI offers Private Eyes the following pricing for services to be provided to Coca-Cola.

"In Network" Drug Screening                         $23.00 per test
- Source in-network collection facilities
- Set up in-network collection facilities
- Complete urine specimen collection
- Set up laboratory accounts
- Order laboratory supplies
- Complete laboratory analysis
- Order pre-printed Custody and Control Forms
- Oversee Medical Review Officer services
- Report results
- Store records
- Consolidate urine collection, laboratory, MRO and program management fees

"Out of Network" Drug Screening                      $41.00 per test
- Source out of network collection facilities
- Set up out of network collection facilities
- Complete urine specimen collection
- Set up laboratory accounts
- Order laboratory supplies
- Complete laboratory analysis
- Order pre-printed Custody and Control Forms
- Oversee Medical Review Officer services
- Report results
- Store records
- Consolidate urine collection, laboratory, MRO and program management fees

Mobile/After-Hours Services:                          see below
- Coordination for the collection of mobile/post-accident tests performed at $100/hour (one-hour minimum) plus the actual cost of the collection
- Mobile charges (which are based on mileage, wait time, number of people tested, tests performed and other applicable charges) passed through at cost

Please note that EI has additional services that can be quoted at a future time including:

DOT or Non-DOT physicals scheduling, review, and compliance
Medical Consultation and return to duty evaluation
Employee Assistance Programs (EAP)

Follow up testing / rehabilitation management
Policy development
Records Management (Driver files, compliance checks, etc)

**Payments and Rebates**

EI's billing data to Private Eyes will be at the rates listed above. Alternately, EI's bill to Private Eyes can be at a reduced rate and Private Eyes can "mark up" the amount for invoicing to the client.

It is EI's understanding that CocaCola will be offered a 3% discount (based on $23.00 actual cost of goods) for any invoices paid to Private Eyes less than net-15. Accordingly, EI will offer Private Eyes a 3% discount for any invoice paid to EI net-22 or less.

**Future Agreements**

It is understood and agreed to by both EI and Private Eyes that there may be additional agreements and / or contracts to formalize this or other business initiatives. Therefore, this LOU may be superceded.

Sandra, in the brief conversations that we have had to date, it is obvious that both of our companies have similar goals and priorities on service, value add, and mutually beneficial relationships. EI strives to infuse integrity and ingenuity into an industry that is plagued with border-line business practices. I am confident that as we continue to develop our abilities to partner together, our companies and our clients will benefit from our efforts.

Please do not hesitate to contact me. I look forward to working with you and your organization. To formalize our understandings and intents, if you find this LOU agreeable, please sign and return a copy to me.

Best Regards,                                     Agreed to by:

Todd Oliver                                       Sandra James
Employee Information Services                     Private Eyes Incorporated

                                                  Date 3/29/02

**EXHIBIT 4**

LAW OFFICES OF
**TERENCE DANIEL DOYLE**
A PROFESSIONAL CORPORATION
571 Hartz Avenue
Danville, CA 94526
925-855-4330 (Telephone)
925-855-4344 (Facsimile)

WRITER'S DIRECT DIAL NUMBER
925-314-2320

Terence Daniel Doyle*‡ LL.M. Taxation
Micha el LaMay
Ron A. Snideberg
David  J. Golde
R. Joseph Skatzko
Richard O. Grossman

‡ Licensed in California, Arizona and Hawaii

July 2, 2004

Bart  Valdez
First  Advantage Corporation
805  Executive Center Drive West, Suite 300
St. P etersburg, FL 33702

    *Re: Private Eyes, Inc.*

Dear Mr. Valdez:

    During a conference call on April 27, 2004 we reached an agreement regarding compensation payable to Private Eyes, Inc. (PEI) from First Advantage Corporation (FAC) resulting from PEI's  loss of annual Coca Cola Enterprises (CCE) MVR business to FAC.

    FAC was to pay PEI $1.80 for every MVR pulled by FAC for CCE monthly, payable within thirty (30) days of the end of the month, starting with the month of March 2004.  FAC was also to provide PEI with regular reports showing CCE MVR activity.  No payments have been received thus far and no reports have been shared.

    Please ask whoever should be processing the payment and generating the reports to do so forthwith.  Thank you for your intervention in this regard.

                    Very truly yours,

                    LAW OFFICES OF TERENCE DANIEL DOYLE

                    Terence Daniel Doyle, Esq.

cc: Sandra James, President, Private Eyes, Inc.

Via Fed Ex